CODY *et al. v.* STATE.

(Division B.  June 5, 1933.  Suggestion of Error Overruled September 18, 1933.)

[148 So. 627.  No. 30442.]

Leftwich & Tubb and Talmage B. Tubb, all of Aberdeen, for appellant.

**W. D. Conn, Jr.**, Assistant Attorney-General, for the state.

Argued orally by **Talmage B. Tubb**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellants were indicted, and convicted of the murder of one Jim Parrish, in Monroe county, Mississippi, and sentenced to life imprisonment, from which judgment they appeal here.

The evidence to sustain the conviction is that of the wife of Jim Parrish, Mrs. Luchester Parrish, who claimed to have recognized the voice of Trannie Gregory, and also to have seen both of them. The killing occurred about one o'clock at night.

The testimony of Mrs. Luchester Parrish was to the effect that she was awakened by her husband while he was fumbling for a match box on the mantel; that shortly after she was awakened her husband called out and asked if the parties did not need a lantern, and the voice of Trannie Gregory answered that matches would be sufficient. She states that her husband stepped out on the porch and asked who it was, and that she heard Gregory's voice answer, "By God, it's Trannie Gregory and John Cody;" that two guns were then fired, and that her husband fell, and that she opened the door and stepped out on the gallery, and that John Cody and Trannie Gregory were within six or eight feet of her and had their guns pointed at her, but did not shoot or undertake to harm her; that they went from the house to the road under a tree and she recognized both parties; that John Cody had on red boots, and Trannie Gregory did not have on boots or high-top shoes.

The sufficiency of this testimony is challenged because it is alleged the night was shown to be dark, it having rained the preceding afternoon, and the early part of the night was cloudy.

The testimony of Mrs. Luchester Parrish was to the effect also that she and her husband had been sleeping in the room with the shades pulled down, and that when she came out of the room she could see both parties and identify them; that after the killing she called to one of her husband's brothers, and that he and his wife came to the yard fence and she told them what had happened, and they went to a neighbor, a Mr. Ritter, to telephone for a physician and help. Another brother and sister of the deceased were spending the night at the Ritters, and they came over to the house of the deceased, and all of these witnesses testified that when they came up, or as they came up, they could see the body of Jim Parrish on the porch where he fell and could recognize it from the distance of the oak tree at the edge of the road.

There was considerable testimony of a conflicting

nature between the different witnesses as to the extent of the dark, but it was conceded that there was no moon shining at the time and that it was a dark night. Several witnesses, however, supported the testimony of Mrs. Luchester Parrish, and other witnesses mentioned their ability to see and recognize the deceased as they came up to the house, and as to the character of the night.

When Will Parrish, one of the brothers of the deceased, came to the deceased's home, Mrs. Luchester Parrish took him into the kitchen and told him she had recognized the parties who had killed Jim Parrish and told him who they were. The evidence as to this was objected to, and that it may be seen exactly what transpired in reference to this conversation, and the ruling of the court therein, we quote as follows:

"Q. When Will came over there, had Mr. Rufe Brassfield gotten there at that time? A. No, sir.

"Q. What did you do with him, with Mr. Will Parrish? A. I told Will I seen them and knew them. Defendants object to the conversation.

"The Court: It is competent to say she told him who it was if she doesn't go into detail, objection overruled. Defendants except.

"Q. Where was that when you told him that? A. I carried him in the kitchen and told him how it happened.

"Q. You say that none of the officers came there until after he came? A. No, sir."

When Will Parrish was introduced as a witness, the state sought to show by him that Mrs. Luchester Parrish told him that she recognized the parties, and that they instructed her to say nothing about it except to the family and the officers. We quote this testimony and the rulings of the court thereon, as follows:

"Q. Did you see her afterwards in the kitchen? A. Yes, sir.

"Q. Did you give her any instructions in there? A. After she told me who it was, I told her not to say anything about it only to the officers.

"Q. Where were the wounds in your brother's body?
A. One in the stomach and one in the back of his head.

"Q. What kind of wounds were they? A. They were shot.

"Q. Was he alive or dead? A. He was dead when I got there.

"Defendants object to any and all conversations with this witness had with Mrs. (Luchester) Parrish out of the presence of these defendants.

"The Court: Sustained as to the conversations. Defendants object to the instructions he gave her.

"The Court: Sustained.

"Counsel for the State: I would like for the testimony to show he gave her instructions.

"The Court: The objection is sustained. Gentlemen of the jury, you are not to consider that she was instructed, not to talk about the case except to the officers.

"District Attorney: We would like to take that up out of the hearing of the jury. (Jury retired from the box.)

"Counsel for the State: It is our contention, our idea, as has already been indicated by questions asked Mrs. Parrish on cross-examination, that the purpose of the defendants is to prove she didn't know who the parties were and that she said she didn't know. We think any statements she made as to the identity of the parties after the thing happened and then any instructions and any orders the officers might have given her about not telling other parties about who it was would certainly be competent along that line.

"The Court: The court's understanding was if she was asked if she didn't state certain things, she said she did not. If she told them some different kind of story, that's different. She denies telling that she didn't know.

"Counsel for State: And then on the contrary, we will be able to show that she did tell immediately after it happened to this man who it was, and he instructed her

not to tell who it was except to the officers and they told her not to tell.

"The Court: My understanding was on cross-examination she was asked if she made certain specific statements, and she said she didn't.

"Counsel for defendant: We are laying a predicate to contradict this witness. They propose to prove by somebody else that prior to that time when none of these defendants were present, that she had told these she did not know. In other words, try to bolster up her testimony by private conversation held between these people and her witnesses when they were not present and knew nothing about it.

"The Court: As I understand as a proposition of law, if she told who these parties were, I don't think it would help her a particle. If she stated to these people she didn't know who they were, that wasn't the instructions the officers gave her, she could have said she did know."

It will be seen, from these rulings that the court refused to permit Will Parrish to testify as to a conversation between Mrs Luchester Parrish and himself and as to what instructions he gave her. The only testimony outside that of the officers which the court permitted to go to the jury was her statement that she told Will Parrish that she knew who the parties were.

It will be appropriate here to state some of the facts developed before considering this proposition.

After the sheriff had been telephoned for and reached the premises, there were certain tracks seen leading from the porch where the parties doing the shooting stood, eastward to the tree testified about by Mrs. Luchester Parrish, through an oat field, and then separated, one going south some distance, and the other north, and then came together near the highway where a car was parked. Near this place where the car was parked, some tracks were identified by the peculiarities in both boots and shoes as being the same that were found at Jim Parrish's house and through the oat field.

Two other witnesses testified that, on the night in question, they were passing the road and saw a model T Ford car parked on the side of the road, one witness having passed at about between eleven and twelve P. M. and the other near one o'clock A. M. Both testified that this model T Ford car was in a dilapidated condition with part of the curtain torn or ripped loose; that the father of John Cody owned such a car; and that the said John Cody, with Trannie Gregory, who had married Cody's sister, had this car on Sunday morning, at ten A. M. about one mile from Trannie Gregory's home, when they were arrested. The said John Cody had formerly been the husband of Mrs. Luchester Parrish, by which marriage there was one child in the custody of John Cody. Mr. and Mrs. Jim Parrish had been married approximately four years.

The sheriff and deputy testified that, where the car was parked on the highway the night of the killing, one of the parties had slipped down a clay embankment, and, when Trannie Gregory was arrested, he had overalls on with clay dirt thereon, and asked permission to change his clothes, which was granted. He took off his shoes which were wet and muddy with red mud and put on another pair, and without his consent, and also without any protest from him, the officers took his discarded pair and then carried him and John Cody to jail. When they reached the jail, the officers asked John Cody for his boots, which, without protest, he took off and surrendered to them. These boots and shoes were carried to the place of the killing and found to fit precisely into the tracks there. The shoes had a loose tack on one heel, and this projecting nail or loose tack caused the shoe to make a peculiar impression. The corrugations had worn off one of the soles of the boots, but the other was corrugated. The sheriff later sent a deputy to secure the muddy overalls, but in the meantime they had been washed.

There was testimony by the parents of John Cody, and by his brother and his brother's wife, to the effect that

the car of Tom Cody, the father of John Cody, was not capable of being used at night because the lights were out of repair, and these witnesses also testified that the car had not been moved out of the place where it was until the Sunday morning when John Cody took it out; that there was only one set of tracks visible in and about the shed, and that owing to the rain the car made tracks.

The sheriff, when called on the witness stand, testified without objection that he was informed that the parties had been identified by Mrs. Parrish who they were, and that he made his investigation and arrests in the light of this information.

There was proof by both John Cody and his parents that he was in his parents' home during that night; and also proof by Trannie Gregory and his wife that he was in his home some miles away from the home of Tom Cody, and was in the Tombigbee bottom.

There was some testimony by some parties sitting up on account of sickness, neighbors of Jim Parrish, to the effect that they heard a car start up around one o'clock and proceed in an easterly direction from near Jim Parrish's home toward the east and thence south.

Most of the witnesses testifying for the defendants spoke of the darkness of the night, and these had either gone out of a lighted room into the darkness, or had proceeded with a light along a road some time during said night.

One of the principal grounds relied on for a reversal is the admission of the testimony of Mrs. Luchester Parrish, the wife of the deceased, that she told Will Parrish who it was, and that she recognized them. A number of authorities are cited upon this proposition, but none of them are precisely in point. In Williams v. State, 79 Miss. 555, 31 So. 197, 198, it is stated that "it is a principle of the common law that previous declarations of a witness in conformity with his testimony before the court cannot be given in evidence at all affirmatively; and, while a witness may be impeached by showing that

he has made declarations contradictory to his evidence before the court, yet evidence that he has on other occasions made statements similar to what he has testified in the cause is not admissible, except under certain circumstances not existing in this case,'' citing authorities. An examination of this case shows what the court was talking about was the fact that the witness whose property had been burned had stated that he had the defendant under suspicion. The prosecuting witness, Smith, testified that he told Cottrell and several other persons of such proposed burning, and thus placed before the jury his antecedent declarations of his testimony thus given, and Cottrell and said other persons were introduced and corroborated Smith, saying that Smith told them he was planning to catch the defendant in the burning of his property. It will be seen from this statement that what was before the court was an entirely different proposition from what the court permitted to go into the evidence in this case.

In the case of Ashford v. State, 81 Miss. 414, 33 So. 174, Ashford had been convicted of an assault with intent to rape, and the court permitted details as disclosed by the girl to her mother to be given in evidence, and it was held that this was not permissible.

In Moore v. State, 102 Miss. 148, 59 So. 3, Moore was indicted and convicted of an assault with intent to commit rape. The facts in that case were that three girls, seventeen, fifteen and twelve years of age, were sleeping in the same room. During the night, one of these girls awakened feeling crowded, and put out her hand to move her sister away, and found it was a man. Two of the girls fled into their father's room. The man escaped through the window. The twelve year old girl who was sleeping in the same room recognized the man as being the defendant, and the court allowed proof of the statement that she made to her sisters at the time that she recognized the defendant to go into the record. This girl had testified that she recognized the man, and the court

held that it was error to permit the witness to testify that she told her sisters that she recognized him.

We have had great difficulty in finding cases dealing with the specific proposition. In fact, the only case that we have found that seems to be directly in point is the case of People v. Mead, 50 Mich. 228, 15 N. W. 95, in which the opinion was written by Judge Cooley, and, in part, held as follows (syllabus 1): "A witness in a criminal case can testify, as introductory to his own investigations, that another witness had recognized the prisoner after the offense was committed; but he cannot state what such witness said as to the respondent's identity, as this would be hearsay."

We are not entirely satisfied with the announcement of the Michigan court upon this subject; but we do not believe, in the present case, the admission of the fact that Mrs. Luchester Parrish told Will Parrish that she recognized and knew the parties constituted reversible error. A safe rule would be to confine the state's proof to facts that the witness has testified to, and not to support it by a previous declaration. In the present case, the facts and circumstances are pertinent as showing that the sheriff acted upon the information communicated to him in making the arrest, and the admissibility of evidence depends, somewhat, upon the lawfulness of the arrest. Consequently, the taking of the boots and shoes and using them in making comparisons with the tracks around the scene of the crime does not constitute a ground for reversing the case, as contended, nor does the statement by Mrs. Luchester Parrish that she recognized the parties at the time, and on the night of the killing communicated that fact to her brother-in-law, in the light of all the facts. It is not prejudicial to the defendants, and is not error which will warrant us in reversing a conviction. A reversal is only warranted for such error as is harmful and which might influence the jury wrongfully in reaching a conclusion of guilt. There are many cases which come up before this court where similar proof

is admitted without objection and not noticed, showing that many of the members of the bar do not regard such statements as being influential. We cannot reverse for this error, if it be error, which is not necessary to be here decided. We are certain, from all the facts in this record, that it is not reversible error.

It is argued that the evidence is insufficient to sustain the conviction because the probability that Mrs. Luchester Parrish could not see clearly enough at night to identify the parties. Of course, this was a question of fact about which the jury's knowledge is equal to that of the court. A number of witnesses testified that they recognized the dead body of Jim Parrish at the same distance that same night, all in support of Mrs. Luchester Parrish's testimony. Furthermore, the testimony is corroborated by material facts, and the conviction does not rest entirely upon the ability of Mrs. Luchester Parrish, the wife of the deceased, to recognize and identify the parties. She testified positively that she recognized Trannie Gregory's voice; that, while she was the wife of John Cody, the said Gregory visited their home courting Cody's sister, whom he afterwards married, and that she (Mrs. Luchester Parrish) had full opportunity to recognize his voice.

There is no doubt but that there were two parties present. There were two shots fired. On the morning following the killing, both of the defendants were found several miles from the Parrish home, near the Gregory home, and John Cody was in possession of the car answering to the description of the one parked upon the roadside to which the tracks led from Jim Parrish's home.

The contradictory testimony for the defendants that Mrs. Luchester Parrish, on the morning following the killing, made statements to other parties that she did not know who did the killing, and that she was afraid to go out for fear she would be shot, is offset by the testimony of Mrs. Luchester Parrish, and was a question for the jury. In other words, testimony tending to impeach

her is not so clear as to be convincing that she made such statements, and the jury could have well believed that she did not, as they evidently did.

It is argued that it was error to introduce the footwear which had been compared with tracks leading from the Jim Parrish home, and which footwear had been taken from the defendant. It must be remembered that this footwear was taken after the defendants had been arrested. In our view, there could be no question of the lawfulness of the arrest, and it is permissible for the officer making the arrest to take from the defendants such things as tend to show the commission of the crime for which they are arrested. There was no protest made at the time the officers took these things, and nothing to show that they were taken against the objection of the defendants. But, even if there had been vigorous objections, it would not have been available. The officers had the right to take from them such things while under arrest.

This case, in some of its aspects, depends upon circumstantial evidence, and, while the circumstances afford some degree of proof supporting Mrs. Parrish, when considered with all the facts, it is made more forceful in proving the issue. We think the boots and shoes taken for the purpose of comparison with the tracks come within recognized principles of law.

It is also argued that the testimony with reference to the model T Ford car, owned by the father of John Cody and the father-in-law of Trannie Gregory, should not have been admitted in evidence. This evidence is, of course, of some force, when considered in connection with all the evidence. Manifestly, the fact that a car was seen parked on the roadside of a similar kind to that owned by Tom E. Cody would not prove the issue. No conviction could be had upon that fact alone, but, when taken in connection with the other circumstances in the case, it is an influential factor and was admissible to be introduced in evidence. We find no error in regard to this.

Next it is argued that it was error to permit a cross-examination of Mrs. Lula Durrett, one of the witnesses, as to whether or not she had some sort of misunderstanding with Jim Parrish in regard to a crop of one of her tenants the year before, and also whether or not she had visited the Jim Parrish home. It was sought by Mrs. Durrett's testimony to impeach the testimony of Mrs. Luchester Parrish. Such cross-examination was permissible to show bias, motive, or hostility on the part of the witness, and there was no effort made to impeach her testimony in that regard. A wide latitude is allowed on cross-examination to show bias or motives for the purpose of affecting the credibility. The rule with reference to contradicting a witness is not the same as what may be asked on cross-examination. In order to impeach a witness, the testimony about which the witness is to be impeached must be material to the issue and must be of such character as would be relevant to the issue being tried; but when it comes to bias, friendship, motive, or hostility, a witness may be cross-examined as affecting his or her credibility as a witness. The state, in the examination of Mrs. Durrett, did not seek to show affirmatively that she swore falsely about such matters. The like objection is made to the cross-examination of Mrs. Trannie Gregory, the wife of the defendant, Trannie Gregory, as to whether or not John Curry, who lived in the Gregory home, had been told by Mrs. Gregory that her brother had been trying to get Trannie to do this job. Mr. and Mrs. Gregory were tenants of John Curry and he occupied a room in their home at the time of the killing. Curry was not introduced as a witness. It appeared that he had testified on the preliminary and habeas corpu' trials, but was no longer living at the place. What his testimony was on the former trials does not appear. Mr. Trannie Gregory was asked whether they did not ta' about the matter a number of times after Trannie Greg' ory was arrested and while he was in jail. She testified that Curry occupied a room across the hall, and that he

was there on the evening in question. She was asked if she had stated to Curry that her brother, John Cody, had been trying to get Trannie Gregory for a year to do the deed done that night. She denied making that statement to him, but stated that Currie asked her if she had stated to another party the fact of such statement, and that she told him that she had never made such statement. There was no effort to impeach her upon this statement. In other words, the state did not seek to show any improper relation between Mrs. Trannie Gregory and Curry, nor was anything of that kind suggested. She was merely asked if she had made a statement to Curry inconsistent with her statement on the witness stand, which was permissible.

It is assigned as error that the court erred in giving the instruction for the state, reading as follows: "The court instructs the jury for the state that murder is the killing of a human being without the authority of law, by any means or in any manner, when done with the deliberate design to effect the death of the person killed, and not in necessary self defense; and if you believe from the evidence in this case beyond a reasonable doubt, that either of the defendants, John Cody or Trannie Gregory, so killed Jim Parrish, and that either one or the other was present and aided, abetted, or assisted in said killing, or condoned or encouraged said killing in any manner, then you should find the defendants both guilty as charged and should return either of the following verdicts. . . ."

Technically, this instruction is erroneous. The word "condone" is improper in such instruction, and should not be there. It does not make one guilty of murder that he condones such murder. But, when considered in connection with this case, it could not, we think, have had a prejudicial effect. The circumstances are such as to show clearly and beyond every reasonable doubt that two persons committed the murder, and that it was not committed by one alone. The fact that they were both

at the deceased's house, late at night, and called him out of the house on a pretense, a desire for matches, in order to kill him, is bound to have made the killing a design which they purposed to carry out. It would have been entirely different had the killing been done under different circumstances—where the presence of parties might be accounted for by a lawful purpose—but here the parties went together, at one o'clock at night, when, presumably, the neighbors were all asleep (with the exception of one who had sickness in the house and was not asleep) and when the deed could be done without any high degree of probability of its being detected. Could a party going with another, under such circumstances, be reasonably held to have been there for an innocent or lawful purpose? He could only have been there to assist or aid in the killing. If there were any testimony in this record by which either of the defendants could be lawfully justified in being present, we would reverse this case for the giving of this instruction. Just how the word "condone" happened to be in the instruction, we do not know. Counsel should not use words in an instruction unless they know the meaning thereof, an' should not experiment with language. But, as state above, that is not reversible error, and we cannot say that it was harmful to the appellants in this case.

We have carefully considered, after an extensive examination, every phase of this case, and have found no reversible error therein, and the judgment will be affirmed.

Affirmed.