## PATTON *v.* STATE.

(In Banc. Feb. 10, 1947. Suggestion of Error Overruled March 17, 1947.)

[29 So. (2d) 96. No. 36298.]

L. J. Broadway, of Meridian, for appellant.

414

**Greek L. Rice,** Attorney General, by **Geo. H. Ethridge,** Assistant Attorney General, for appellee.

**Griffith, J.,** delivered the opinion of the court.

Appellant, an adult young negro, was indicted, convicted, and sentenced to death for the murder of J. L. Meadows, a middle aged white man, the homicide having been in the furtherance of robbery.

In due time appellant made a motion to quash the indictment because no negro was on the grand jury panel, although there were qualified negro men in the county.

It has long been settled in this country that an intentional and arbitrarily systematic exclusion of negroes from grand and petit jury lists solely because of their race and color denies the equal protection of the laws to a negro charged with crime, so that at this time no parade of the authorities is necessary on that point.

There is no question raised here, nor could there be, that the jury laws in this state require that jurors shall be qualified electors and must be men, not women, and that a large number of persons are exempt from jury service, including, among others, physicians, ministers, and teachers.

This preliminary statement sends us at once to the facts, so far as shown by the record, as to which it must first be observed that the finding of facts by the circuit judge is to be accepted as true if supported by testimony and is not against the great weight of the dependable evidence. Some few witnesses were introduced who made conjectural estimates or guesses, admitted by them to be such, which may, therefore, be laid aside. There was one,

however, who had made, in 1944, a search of the records as to the qualified electors in the county, and made it carefully because to be used in a lawsuit over the matter of excluding the sale of beer in the county. His search revealed that there were more than 12,000 qualified electors in the county, of whom between 30 and 60 were colored, and of the latter the majority were teachers or preachers, exempt from jury service. The only other witness who had made a check of the records was the county judge. He made such a check in 1942. His conclusion from his check was that there were about 11,000 qualified electors in the county and of these the negro electors were less than 100, not specifying how many less.

The next witness, high in the order of dependability, is the circuit clerk, and this because he is the officer whose duties bring him nearest into intimate and daily contact with these records. He was questioned about District 1, in which the City of Meridian is located, and he said there were not over 50 colored electors in that district, of whom half were women. He was not questioned particularly as to those outside District 1. Next to the clerk in the possession of accuracy would be the sheriff who must from time to time go over these records, and his estimate of the number of negro electors in the county was from 40 to 50, and nearly all these from District 1.

As to the negro electors outside District 1, the members of the Board of Supervisors from those districts were called as witnesses and they testified particularly as to those districts. Their testimony showed that there were no negro electors in District 2 and 4; only one in District 3, and he a medical doctor exempt from jury service, and in District 5, four or five negro electors, and as to them no showing whatever was made whether they were teachers, or ministers or physicians, or whether not otherwise exempt from jury service.

From the above summary it is to be seen that the trial judge was sufficiently supported, and therefore justified, in finding that there were not over 50 qualified negro

electors in the county, of whom, according to the testimony of the clerk, not disputed in this particular, one half were women, which would leave 25 qualified negro male electors. He was justified also in accepting the testimony, not seriously disputed, that at least half the negro electors, men and women, were teachers or ministers or physicians, or were otherwise exempt from jury service. Of the 25 qualified negro male electors there would be left, therefore, as those not exempt, 12 or 13 available male negro electors as compared with 5,500 to 6,000 male white electors as to whom, after deducting 500 to 1,000 exempt, would leave a proportion of 5,000 nonexempt white jurors to 12 or 13 nonexempt negro jurors, or about one-fourth of one per cent negro jurors,—400 to 1.

It is undisputed that approximately 1,200 names of jurors had been put on the jury lists by the board of supervisors between May 9, 1945 and the time of this trial in February 1946. Applying to the 1,200 jurors the proportion of 400 whites to one negro, as above mentioned, it could be said that among the 1,200 there ought to have been three negroes, assuming for the purposes of this case that all other considerations were equal, and the proof is undisputed that within that time two or three negroes were put in those lists; and inasmuch as the movant had the burden of proof, this means that there were three negro jurors in the lists, wherefore to have put in more would have been to discriminate not against negro jurors but in their favor.

This is no such case, therefore, as was Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84, where there were as many as ten-percent of qualified negro jurors and where less than one percent had ever been listed as jurors in such manner that they would be called, including the year in question. Nor is the fact that no negro had actually served in the county which we are now considering, within the year above mentioned, any controlling evidence, there being no proof whatever as to why the three

mentioned did not serve. Whether they failed to appear or whether they presented excuses and were released by the trial judge, or whatever else the reason, the record is wholly silent. In the absence of such proof we must assume that, so far as the officers or others in authority were concerned, the absence of the negroes from actual service was upon legitimate grounds, and not otherwise. We know, as all know, that white men, in large numbers, although qualified electors, strive to avoid the burdens and distractions of jury service and resort to every available device and excuse to evade it. Even more so can we be certain that the few negro jurors in a county such as this when called would be moved by the same desire and purpose to get excused.

We have not gone back of the year of and immediately preceding this trial, as to the jury lists, for the evident reason that in that respect we are concerned with that which bears real relation to the instant case and therefore with the present and that which was in the immediate past,—not with what may have happened in remote days. And in following out the mathematical calculations per capita among the nonexempt qualified persons, we are not to be considered as having resorted to it as an exclusion method for the solution of the question with which we have above dealt. Upon such a broad issue other considerations are to have their proper bearing. We have proceeded as we have here, because that method is sufficient for the present case.

The trial judge overruled the motion to quash, and in this, as we have already indicated, the evidence was sufficient to sustain his action. Thereupon appellant moved for a change of venue, which was denied by the trial judge, and upon this issue, too, he is sustained by the evidence, or at least we can not say he was manifestly wrong.

Appellant then moved for a special venire and that the venire be drawn from the jury box, but it appearing that the jury box had been refilled within thirty days of the

motion, the court ordered the sheriff to summon a venire of 100 jurors from the county at large, and of this appellant complains. The Court was correct under Moon v. State, 176 Miss. 72, 168 So. 476, which we now reaffirm. Appellant complains also that no negro was summoned by the sheriff on this special venire. There is not a word of testimony that the sheriff deliberately excluded negroes from this venire or that he had any such thought or purpose. For the reasons already heretofore stated there was only a chance of 1 in 400 that a negro would appear on such a venire and as this venire was of 100 jurors, the sheriff, had he brought in a negro, would have had to discriminate against white jurors, not against negroes, —he could not be expected to bring in one-fourth of one negro. Two other complaints about the special venire are made, but these are plainly not maintainable and are therefore not further discussed.

On the merits an outline of the facts is: The crime was committed on Monday, February 11, 1946, in a small store operated by the deceased, as an adjunct to a small roadside night club located about four miles south of Meridian, on Highway 45. The deceased left his home, not far from the store, about 6 o'clock a. m. and was found in the store between 10 and 11 o'clock a. m. When he was found cold in death. On his body, and particularly about his head, were fifty-four wounds, and there were several additional but smaller wounds. No third-person witnessed the crime, but near the body a hat was found and this hat was immediately identified as one given not long before to appellant by deceased and which appellant, at that time, had worn away. The officers promptly arrived and found tracks plainly made, as by some person in haste, leading away from the store towards the woods to the west, and casts were immediately made of these. The hat which was found near the body pointed, of course, towards appellant, who had been a helper around the store until about two weeks before, and he was arrested in the early afternoon of the day of the crime. When he reached the

jail his shoes were taken from him and they fit the casts. The shoes and casts were placed before the jury for comparisons to be made by the jurors themselves.

Among the articles missing from the store was a lunch box, bearing the initials of the deceased. This box was used by deceased as a cash box. Missing also was a billfold, a fountain pen, and the hat of the deceased. A coat which had been hanging inside by the store door was missing. On being questioned at the jail, appellant stated that he could point out to the officers where he had hidden these several articles in the woods. He thereupon went with the officers into the hilly woods, about half a mile from the scene of the crime, and pointed out to them where he had concealed the articles and they were there found. The officers had no previous information of these places. The witness, Ruffin, was present when part of them were found, and the witness, Gunn, was present when the remainder were uncovered, appellant being present and pointing out on both occasions. In the lunch box found wrapped up in the coat were the billfold, the fountain pen but no money except one dollar. At a separate place pointed out by appellant, there was found $301.85 buried in the ground by a large pine tree. The locations were in the general direction towards which the tracks, already mentioned, led.

There was other competent evidence, the details of which are not pursued for the reason that what has been recited was ample to sustain the conviction.

Appellant complains that by the taking of his shoes and thereupon comparing them with casts, he was in effect forced to give testimony against himself in violation of constitutional guaranties. It is not necessary on this issue to do more than to quote from Cody v. State, 167 Miss. 150, 165, 148 So. 627, 631, which we now reaffirm: "It is argued that it was error to introduce the footwear which had been compared with the tracks leading from the Jim Parrish home, and which footwear had been taken from the defendant. It must be remembered that this

footwear was taken after the defendants had been arrested. In our view, there could be no question of the lawfulness of the arrest, and it is permissible for the officer making the arrest to take from the defendants such things as tend to show the commission of the crime for which they are arrested. There was no protest made at the time the officers took these things . . . But, even if there had been vigorous objections, it would not have been available. The officers had a right to take from him such things while under arrest.''

It is complained that the statements by appellant about where the articles above mentioned could be found, and the evidence that he accompanied the officers and pointed out where they were hidden, were erroneously received without a preliminary showing that the statements were voluntarily made and that his conduct in pointing out the hiding places was entirely voluntary on his part. There was no attempt here to use any confession in its entirety, or any part thereof save such as had definite relation to the articles mentioned and to the pointing out of the places where appellant admitted he had concealed them, and as to this no more is necessary than to quote from Warren v. State, 174 Miss. 63, 69, 164 So. 234, 235, wherein it was said: ''Although a confession not voluntary may not be received in its entirety, nevertheless such particular parts of it as definitely direct to the place or places where property or other evidence may be found is admissible, when and if in pursuance thereof the property or evidence is accordingly afterwards found.''

We have carefully examined the other alleged errors, and are of the opinion that none of them is sufficient to require a reversal.

Affirmed, and Friday, April 4, 1947, is fixed as to the date for the execution.