## PATTON *v.* STATE.

In Banc. May 23, 1949—June 13, 1949. .

No. 37076. (40 So. (2d) 592—41 So. (2d) 55).

L. J. Broadway, for appellant.

124

George H. Ethridge, Assistant Attorney General, for appellee.

Alexander, J.

This case appears before this Court for the second time. Our affirmance upon the first appeal, 201 Miss. 410, 29 So. (2d) 96, was reversed under directions of the United States Supreme Court. 332 U. S. 463, 68 S. Ct. 184, 92 L. Ed. 76, 1 A. L. R. (2d) 1286; Id., 203 Miss. 265, 33 So. (2d) 456. This appeal is from a second conviction of murder, the judgment imposing the death penalty.

We examine first the refusal of the trial court to quash the indictment upon the ground that, because of an alleged systematic and deliberate exclusion of Negroes from the jury lists, the indictment was found by an illegal grand jury. Reliance is placed upon the assertion that this was the basis for the former reversal, and that the situation has remained unchanged. Let us investigate the evidence of an altered procedure as disclosed by this record.

The circuit clerk testified with corroboration and without dispute that there were properly registered by him during the period between January and July 1948, 11,437 persons, of whom 209 were Negroes. The board of supervisors at a proper adjourned meeting on June 29, 1948, filled the jury boxes, theretofore depleted, with names furnished by the respective members of the board. There

were 617 names supplied by the supervisor from beat one. In this list were 12 Negroes. From beat two, there were supplied 115 names, selected in alphabetical order. There was found only one member of the Negro race. His name was included. From beat three, there were 150 names, including 3 Negroes. These were also chosen alphabetically. In this beat, there were only 4 Negroes registered, one of whom was disqualified for jury service, wherefore 100% of all qualified colored voters were included. In beat four, there was only 1 Negro registered. Whether this person was a man or woman was not shown. In beat five, there were only 5 Negroes registered. One of these was disqualified for the significant reason that he had recently served upon a jury. Of the remainder, it was not shown whether they were men or women.

It will be seen that the number of Negroes registered was less than two per cent of the total. There was a higher percentage of Negroes among those summoned under the venire facias. On the grand jury, there were twenty men of whom three were negroes. There was one Negro upon the list for petit jury service.

The testimony is uncontradicted that the members of the board and the officers of the court were alert to their duty, were advised of the recent admonitions of the Supreme Court, and in a purposeful attempt to comply with constitutional requirements, had impartially filled the boxes from the registration lists with men of sound judgment and fair character. It was shown that a comparatively few Negroes ever registered, and that this list included both men and women, and that out of this total very few had qualified for jury service by the payment of a poll tax. Although the figures could readily be magnified into argumentative material for a charge of discrimination against members of the white race, no such contention is of course made.

It would unjustly discredit this Court to assume that it lacked an awareness of the constitutional prohibitions against discrimination in such cases as an infringement

of the due process and equal protection clauses. Long prior to the emergence of causes celebres which have been headlined as heralds of a rediscovery of civil rights, this Court boldly condemned a purposeful discrimination against Negroes in the matter of jury service. Farrow v. State, 91 Miss. 509, 45 So. 619. See also Hampton v. State, 88 Miss. 257, 40 So. 545, 117 Am. St. Rep. 740. In the first appeal, Patton v. State, 201 Miss. 410, 29 So. (2d) 96, we were constrained to hold that a witting exclusion of Negroes as such from the jury lists was not deducible from the circumstances that negroes had not in the past actually served on juries in Lauderdale County. We drew upon a judicial knowledge of conditions which we deemed were fully explanatory of this circumstance without inciting any adverse presumption. We borrowed the conclusions of Williams v. State, 170 U. S. 213, 18 S. Ct. 583, 42 L. Ed. 1012, wherein the failure of citizens of the colored race to meet the qualifications for jury service could be taken into account even though as an ultimate result there may arise an apparent, though incidental, discrimination.

Our reasoning was found to be in error by the Supreme Court of the United States which found in the statistics shown, a presumption of purposeful discrimination. It was in an attempt to remove the basis for such presumption that the board of supervisors, under legal advice, combed the meager roster of qualified Negroes who had since seen fit to register under an awakened sense of their civil rights, and had been aroused from a lethargy which had theretofore brought the comfort of an absolution from civil duties. The result was that the ratio of Negroes on the grand jury was higher than the ratio of Negroes upon the registration list. It would unjustly impugn both the wisdom and practical common sense of that lofty tribunal to infer that a dereliction, albeit deduced from continued course of conduct, may not be at once effectively remedied by a purposeful and conscientious compliance. Neither logic nor reason could support a

contention that reformation must be acknowledged only by a commensurate probationary period during which sincerity must ripen to a gradual maturity from a new seedling of judicial decision. Discrimination was deduced circumstantially from an asserted practice of long standing; compliance is now established directly by unassailed facts. We conclude that the lists were properly prepared, and that no traces of deliberate or incidental discrimination are discernible.

We pass to the appellant's motion for a change of venue, and the alleged error in its denial. The motion, supported by affidavits, alleged local prejudice. We have thoroughly examined the testimony for and against the motion. A similar motion was overruled in the former trial, which action we then affirmed. We do not find the testimony to make out a stronger case. Witnesses from all parts of the county supported the contention that the defendant could get a fair and impartial trial. The interest manifested in the trial as such, was no more than usual. There were no evidences of special precautions or of the necessity therefor. During the hearing of the motion there were only about fifteen persons present, including officers of the court, attorneys and spectators. We do not find the discretion of the trial judge was abused.

Overruling of a motion for a continuance is assigned for error. It was based upon the same grounds upon which the motion for change of venue was founded. Views heretofore expressed must dispose of this assignment. A motion of similar import was later overruled. It invoked the provisions of Code 1942, Section 2505, whereunder it is provided that a defendant in a capital case, upon demand, may have a certified copy of the indictment and of the special venire "delivered to him or his counsel at least one [full] day before said trial." It is conceded that these instruments were delivered by the sheriff to the defendant in person Friday night. The trial was set the following Monday. Yet, it is argued that service thereof upon the defendant, al-

though in technical compliance with the statute, was not practically effective because of the alleged illiteracy of the defendant. The State showed, however, that his counsel was by the sheriff notified of his action on Saturday morning. We are unable to detect any prejudice to the defendant under these circumstances.

During the trial, the defendant moved to quash the special venire because under the voir dire examination there appeared only one member of the Negro race. There was no showing how many other, if any, Negroes were summoned and failed to respond. We find no error here in overruling this motion.

The defendant during the trial renewed his motion for a change of venue upon the ground that, upon the voir dire examination, seven out of the first twenty-one jurors called were disqualified because of fixed opinions. It was further asserted that there was a large number of deputy sheriffs stationed about the courtroom. The latter allegation lacks record support. Nor do we find in the excusing of the seven jurors any implication inconsistent with a purpose to guarantee a fair and unbiased jury. Moreover, the defendant, although entitled to twelve peremptory challenges, found occasion to exercise only eight.

[6] Errors predicated upon the instructions revolve about ▮▮ a contention that the defendant was entitled to a directed verdict of acquittal and that any verdict of guilt could not rise above the degree of manslaughter. The defendant was refused an instruction authorizing a verdict of manslaughter under appropriate conditions. However, a substantially similar instruction was given which accorded the jury such alternative.

We are brought to the merits of the case, a discussion of which will encompass certain objections to testimony.

On Monday, February 11, 1946, the body of one Jim Meadows was found on the floor of his night club, "Rock Hill." He was badly bruised and disfigured by blows and scratches. There was a clean wound about three inches

wide extending through the chest wall. His battered and bloody body bore fifteen cuts from the head to the shoulders, and approximately fifty smaller cuts or scratches upon the torso. The appellant was arrested shortly thereafter. Tracks leading from the night club toward adjacent woodlands were found to fit the shoes of the appellant, conforming in minute detail to the unique contours of his shoes. There is no dispute that the homicide was committed by the appellant, who so testified upon the trial.

The plea is one of self-defense, and rests solely upon appellant's testimony. His explanation is that he had worked for the deceased some time before. At the time he left the employment, he claimed that Meadows owed him a sum of money; that Meadows refused to pay him, contending that the appellant had taken away property or supplies in excess of any alleged arrears. The subject of this debt was broached at intervals producing no tangible results, but only a sense of increasing irritation in Meadows. There is testimony that Meadows demanded that the matter be considered as closed. His insistence upon this point ranged in degree from a firm demand to a vague threat toward appellant if the matter was again adverted to.

On the morning of the homicide, the appellant came to the victim's place seeking reemployment, which purpose was enlarged by his own testimony: ''I was going back out there with him to get a settlement.'' An agreement for reemployment was reached amicably and without incident. The two then proceeded into the night club. As soon as they entered, the appellant testifies that he asked Meadows ''Now what we—how we going to get together on that other?'' referring to the alleged debt.

As to what there happened, we are urged to invoke Weathersby v. State, 165 Miss. 207, 147 So. 481, 482, and the cases supported thereon in accepting the appellant's version of the affair. The gist of the cited case is that ''where the defendant or the defendant's witnesses [is]

the only witnesses to the homicide, (his) version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge."

According to the appellant's version, upon mention of the alleged indebtedness, Meadows, after cursing him, struck him on the side of the head with an empty soft drink bottle case. The blow was sufficient to knock him against an adjoining wall. Then followed a short colloquy in which appellant disavowed any purpose to cause any "confusion." Whereupon, Meadows struck at him with another similar case. Appellant tried to evade Meadows and leave the room. In attempting to duck beneath the counter, he was caught and dragged back, being held by the collar by Meadows, who then struck him with a broom. When Meadows struck him again with a soft drink case, appellant hit him with a bottle with sufficient force to break it. They fell struggling together, with appellant underneath. The victim was still holding appellant by the collar and attempting to strike him with pieces of coal which lay near. At least one blow was thus made on appellant. After further tussling, appellant suffered blows on the head and arm. It was then that the appellant spied an iron poker about two and a half feet long, which he succeeded in grasping and with which he struck the deceased upon the head. This did not appear to faze Meadows and the struggle proceeded. Thereupon, the issue became centered upon possession of the poker. Appellant regained its possession and struck the deceased a final blow. When the defendant disengaged himself and was quitting the scene "Mr. Meadows was getting up when I went out."

We have detailed no blow by blow account of appellant's complete version. His conduct thereafter attains special prominence. Upon arising from the floor, he detected the pocketbook of the deceased and took possession of it. It was later found to contain over three hundred

dollars. He then took a coat and a lunch box. He also took the victim's hat. All of these articles were hidden in a nearby woods. In the lunch box was money and a fountain pen. The money was hidden in the ground within a glass jar.

After his arrest, he was stripped, and witnesses present testimony that he bore no scratches nor evidences of bodily injury. The officers testified that he voluntarily conducted them to where the stolen articles were cached, and these articles were completely identified as belonging to the deceased. No confession by the accused was sought to be introduced.

██ It is found that the circumstances do not jibe at all with the pattern of the Weathersby case. The body of deceased was found, horribly mangled and almost unrecognizable, behind the counter about where the appellant alleged the struggle ensued. It appears physically impossible for the victim to have risen after the assault, and highly improbable that if still able to stand he would have suffered appellant, without further resistance, to take his goods. Appellant denies responsibility for the vicious and fatal chest wound which could not have been caused by an iron poker. Under the solemn duty to accord this appellant's appeal a conscientious and painstaking consideration, we have concluded, after a careful examination of the record, that the issue of guilt and its grade were issues for the jury.

██ Although the discovery of the stolen articles was at the voluntary direction of the appellant, he complains that such discovery was a product of some mistreatment by the arresting officers. Waiving consideration of the repeated denial of any coercive measures, the articles themselves would in no event be inadmissible. Jordan v. State, 32 Miss. 382; Smith v. State, 166 Miss. 893, 144 So. 471; Warren v. State, 174 Miss. 63, 164 So. 234; McKelvey on Evidence, 5th Ed., Sec. 127; Wharton Criminal Evidence, 11th Ed., Sec. 600. The jury had a right to discount the appellant's version by finding that

the theft of the goods and money of deceased belied an assertion of a peaceful mission.

The defense of this case has been conducted with a zeal and resourcefulness which bespeaks a painstaking concern for the rights of one of its citizens. We share this concern, and have never stayed our hand in interposing the barrier of constitutional rights between the forces of vengeance or prejudice, which are at times the product of over-sensitive social relationships, and the life of its humblest citizen. McGee v. State, Miss., 26 So. (2d) 680, 685; McGee v. State, Miss., 33 So. (2d) 843; Magee v. State, 198 Miss. 642, 22 So. (2d) 245; Id., 200 Miss. 861, 27 So. (2d) 767; Id., 200 Miss. 861, 28 So. (2d) 854; Upton v. State, 192 Miss. 339, 6 So. (2d) 129. We cite these examples neither defensively nor apologetically, nor under any sense of need for justification. On the other hand, we are often reminded that our duty encompasses a concern for the rights of those citizens over the fresh earth of whose graves the blind striding of hot tempered zeal finds no stumbling in its frenzied rush to the aid of one to whose violent act this new mound is an accusing monument. It has been our solemn task to protect the life of the accused against an unjust taking with a solicitude which the jury found was not accorded by the accused to another humble claimant to the law's guardianship.

Other errors assigned are involved in our findings. We find no error, and are compelled to affirm the judgment and sentence.

Affirmed, and Friday, July 1, 1949, fixed as the day of execution.

ON SUGGESTION OF ERROR.

**McGehee, C. J.**

On suggestion of error to our decision of May 23, 1949, in this cause, counsel for the defendant reargues at length one of his original assignments of error to the effect that the trial court erred in overruling his objection to ██ █

testimony of the officers in regard to the defendant having told them and pointed out to them where certain money and other articles could be found, which had been taken from the place of business of the deceased where the homicide was committed. The argument is based on the ground that the defendant did not point out the money and other articles where he had concealed them until after he is alleged to have been whipped or beaten by the officers. But it should be noted that the record fails to disclose the introduction of any alleged confession by the defendant of his guilt of the crime charged. He claimed self defense, and the prosecution offered no testimony that he had ever made an admission to the contrary as to why he committed the homicide. The facts as to the identity of the person who had killed the deceased and as to who had carried the money and other articles from the scene of the crime and concealed them, and as to where they were concealed, were fully established by the defendant in a judicial confession made before the jury as a witness in his own behalf upon the trial of the case on its merits.

In Belote v. State, 36 Miss. 96, 72 Am. Dec. 163, where no confession made by the accused was permitted to go in evidence before the jury, but where the "testimony admitted went solely to the acts and conduct of the accused, in showing where the money was, and in producing and delivering it to the witness" the court announced the rule to be that "whatever diversity of opinion may exist on the question, whether confessions improperly obtained, and which are verified and corroborated by facts and circumstances afterwards found to be in accordance with the statement of facts made in the confession, are admissible in evidence on account of the corroboration, there can be no doubt but that acts of the accused done in consequence of the inadmissible confession, and tending to show his guilt, should be received in evidence."

In Garrard v. State, 50 Miss. 147, it was said that where a confession is induced by threats or by a promise or

hope of favor, the same is inadmissible, but the court there said, ''Although the entire confession cannot be received in evidence, the weight of modern authority is, that so much of the confession as relates strictly to the fact discovered by it may be given in evidence; for the reason, as before stated, of rejecting such confessions is the apprehension that the accused may have been induced to say what is false, but the fact discovered shows that so much of the confession as immediately relates to it, is true. It is, therefore, well settled upon reason, principle and authority, that it is competent to show that the witness was directed by the accused where to find the goods, and that they were found there accordingly.''

In Warren v. State, 174 Miss. 63, 164 So. 234, 235, this Court held that, ''Although a confession not voluntary may not be received in its entirety, nevertheless such particular parts of it as definitely direct to the place or places where property or other evidence may be found is admissible, when and if in pursuance thereof the property or evidence is accordingly afterwards found.''

In Usrey v. State, 198 Miss. 17, 20 So. (2d) 847, 848, it was said that, ''The vice of induced confessions, whether under pressure of threat or promise, is seen not so much in the method used as in the result. It is the improbability of its being true that vitiates it, even though the courts take frequent occasion properly to condemn forcible methods. 22 C. J. S., Criminal Law, Sec. 817, page 1426; 30 Am. Jur., Evidence, Sec. 483, p. 422.''

The danger or vice which exists in the admission of an involuntary confession of the guilt of a crime, in that the confession may be untrue, is not involved in a case where the identity of the slayer is admitted by him on the witness stand and where he points out to the officers the place or places of concealment of money and other articles taken by him from the scene of the homicide, and where upon the trial of the case he takes the stand as a witness in his own behalf and admits as being true that he did take the money and articles from the scene and that

he hid them at the place or places of concealment pointed out to the officers. The defendant cited the foregoing decisions of this court in this original brief herein and quoted from some of them extensively, but for the purpose of contending that there is both a state rule and a federal rule as to whether or not the accused shall be denied due process of law under the 14th Amendment to the Constitution of the United States. But it is our view that ██ ██ it is as much the duty of state courts as it is of federal courts to protect the rights of a citizen under the federal constitution. We know of no federal rule that would require a reversal of a conviction because of the admission of testimony to the effect that an accused has pointed out the place of concealment of money and other articles belonging to one who has been slain and where the accused takes the stand as a witness during the trial and tells a jury under oath that he is the slayer, that he removed the money and other articles from the scene of his crime, and that he put them where they were concealed and pointed them out to the officers. Most assuredly it was not prejudicial to the defendant for the officers to tell the jury that the defendant had told them the same things that he swore to before the jury.

It is also argued again on suggestion of error that the defendant is at most guilty only of the crime of manslaughter in the event he is not entitled to be discharged under the rule announced by this Court in Weathersby v. State, 165 Miss. 207, 147 So. 481, quoted from in our former opinion herein. The well settled rule announced in Weathersby v. State, supra, is not applicable here for reasons hereinafter stated.

██ ██ And a sufficient answer to the contention that the jury had no right to convict the defendant of murder is found in his own testimony before the jury as a witness in his behalf. He had first denied having been present when the homicide was committed. Then his version as a witness before the jury of how he killed his victim

by hitting him once with an empty "7 Up" bottle and twice with an iron poker the size of his finger, the two latter blows being while he was lying on the floor underneath his victim, wholly fails to account for the fifty-seven cuts and bruises found on the body of the deceased, and one of which was a fatal cut over the heart.

Moreover, his theory either of self-defense or manslaughter, both of which were submitted to the jury under proper instructions, is wholly inconsistent with his denial to the officers at the beginning of their investigation that he was at the scene of the crime, and is inconsistent with the fact that he testified before the jury that immediately following the killing he took the pocketbook, a box containing the victim's money, and a coat, all of which he admitted carrying away with him, in his testimony before the jury. On the witness stand he also testified that his victim had two boxes, the one then before him at the trial as an exhibit to the testimony of the officers, and the other a green one—and that he did not exactly know which one of them he kept his money in, the proof showing that he had worked for the deceased and that he did not overlook to take the one in which the money was actually kept.

It was also for the determination of the jury as to whether or not the defendant's story was fantastic wherein he claimed that when he went to the place of business of the deceased on the occasion of the killing, he was asked, "Did I come back to work for him, and I told him I did", and that thereupon they agreed upon the amount of wages to be paid in addition to his board, and that when a balance alleged by defendant to be due for previous wages was mentioned by him, amounting to about $15.00, the deceased said: "Yes, I been trying to catch you, get hold of you, for trying to collect your money", and that thereupon the defendant was struck on the head with an empty wooden cold drink case, as the beginning of the fight.

The claim for prior wages due had been placed in the

hands of an attorney about two weeks prior to the killing, and the attorney, who was a member of the state legislature, had advised the defendant, in substance, that the deceased had disputed the claim and "to wait" until he returned from the state Capitol where he was to be engaged again during the following week. Nevertheless the defendant testified that he went "back out there to get a settlement, to sort of agree with him . . ." etc. In fact he was walking from town out there not to apply for his job back, but to get a settlement, when he happened to catch a ride. It was therefore for the consideration of the jury as to whether or not his former employer, who was interested enough in his going back to work to make inquiry in that behalf upon the defendant's arrival and to agree with him to resume work at a certain monthly wage and board, would have immediately proceeded to try to beat the defendant to death because he mentioned the claim for previous wages; and whether or not the deceased would have agreed to the re-employment of defendant after the latter had placed the claim in the hands of an attorney for collection. The jury was warranted in believing from all the facts and circumstances that the defendant went "back out there to get a settlement" by fair means, if he could, and if not, by force and violence. Such a course of action would not be manslaughter, but murder.

We had heretofore carefully examined and fully considered the record and briefs before rendering our former opinion of affirmance of this conviction, and our decision was reached after a full discussion of the facts and the law at two conferences of the Judges. We have reviewed the same suggestion of error, as to all points reargued and are unable to find any reason for not adhering to the decision heretofore rendered. The suggestion of error is, therefore, overruled.

Suggestion of error overruled.