**O.P. HOLLIS, Petitioner–Appellant,**

v.

**J.O. DAVIS and the Attorney General of the State of Alabama, Court of Appeals, Bullock County, Criminal Courts, Union Springs, Respondents–Appellees.**

No. 88–7477.

United States Court of Appeals, Eleventh Circuit.

Sept. 18, 1991.

J. Dorman Walker, Jr., Montgomery, Ala., for petitioner-appellant.

James B. Prude, Asst. Atty. Gen., Montgomery, Ala., for respondents-appellees.

## PETITION FOR REHEARING [*]

Before HATCHETT, Circuit Judge, RONEY [**] and FAIRCHILD [***], Senior Circuit Judges.

FAIRCHILD, Senior Circuit Judge:

O.P. Hollis appeals from the district court's denial of his petition for the writ of *habeas corpus*. Thirty-one years ago, Mr. Hollis was indicted in Bullock County, Alabama, and convicted of first-degree burglary. Despite Mr. Hollis' *pro se* attempts to challenge this conviction in state court, no state court has ever reviewed his conviction. After two federal *habeas* petitions were dismissed for lack of exhaustion, this third was considered, in part, on the merits. Upon recommendation of a magistrate, the district court dismissed it. We reverse and remand, and direct the district court to issue the writ.

### I. Procedural History [1]

In early 1959, a grand jury indicted Mr. Hollis for first degree burglary, which then

---

[*] The original opinion in this case is reported at 912 F.2d 1343 (11th Cir.1990).

[**] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[***] Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Magistrate Carroll held two evidentiary hearings, in part to determine the extent of Mr. Hollis' prior attempts to challenge his conviction. A number of witnesses testified at these hearings, including Mr. Hollis, the lawyer who represented him in 1959, and the judge who presided over his trial. Their memories were

carried a possible sentence from ten years in prison to death. 1940 Ala.Code, tit. 14, § 85. He was tried and convicted in the Circuit Court of Bullock County on March 25, 1959. The jury set his sentence that same day at 99 years in prison. No direct appeal was taken.

Mr. Hollis is a virtually illiterate black man. What the magistrate referred to as his "inscrutable handwriting," and his very limited ability to formulate written expression have greatly hindered his attempts to secure post-conviction judicial review. Mr. Hollis first filed a *pro se* petition for writ of error *coram nobis* with the Circuit Court of Bullock County in 1961. There is no record of any disposition of this petition; apparently no action was taken. (Mr. Hollis testified that the Clerk of Court "kept it about three years and sent it back.") In 1966, Mr. Hollis filed another *pro se* petition for writ of error *coram nobis* with the Bullock County Circuit Court. Again, there is no record of any disposition of this petition. (Mr. Hollis said the petition was held until 1970, when he signed a petition to withdraw it as a condition of receiving parole.) Magistrate Carroll made no finding of what issues Mr. Hollis attempted to raise in these *coram nobis* petitions. (Mr. Hollis testified that he challenged the exclusion of blacks from the jury in both petitions, but did not specify if the challenge was to the grand or petit jury, or both.)

Mr. Hollis was paroled in March, 1970, but his parole was revoked in September, 1971. He was paroled again in May, 1973, but parole was revoked in April, 1974. Parole was reinstated in May, 1977, and revoked yet again in June 1978.

Mr. Hollis first sought relief in federal court in 1981 but his petition for the writ of *habeas corpus* was dismissed for failure to exhaust available state remedies. He petitioned again in 1984, and counsel was appointed. This petition was also dismissed for failure to exhaust state remedies.

Mr. Hollis then returned to state court, filing another petition with the Circuit Court of Bullock County. This submission, which is part of the record in this case, was prepared by Mr. Hollis, obviously without the assistance of a lawyer. It is handwritten, barely legible, and largely incomprehensible. Counsel was not appointed to help Mr. Hollis pursue this petition. According to the Clerk of the Bullock County Circuit Court, it was not ruled on, as it was "not in proper order."

On January 8, 1987 Mr. Hollis filed this third petition for federal *habeas corpus.* The district court recognized Mr. Hollis' pauper status and appointed counsel. His counsel then filed an amended complaint, asserting four grounds of relief: (1) ineffective assistance of counsel, based on various allegations of inadequate representation; (2) unconstitutional selection of the grand and petit juries, based on the exclusion of blacks from the county jury list; (3) denial of the right to appeal, based on his attorney's alleged failure to tell him of his right to appeal; and (4) improper sentencing, allegedly because Mr. Hollis was sentenced by the judge, rather than the jury, in violation of Alabama law. The respondents denied the allegations, and moved for dismissal based on Mr. Hollis' failure to exhaust state remedies, and his delay in filing for relief.

Magistrate Carroll conducted two evidentiary hearings, during which Mr. Hollis, the attorney who defended him at trial in 1959, and the judge who presided at his trial, testified. The Magistrate then recommended in a written opinion to the district court that Mr. Hollis' petition be denied.

In this recommendation, the magistrate first determined that although Mr. Hollis had not exhausted his state remedies, further resort to state court would be futile because the state court had neither ruled on any of Mr. Hollis' petitions, nor appointed counsel "in order to overcome the problem caused by the petitioner's inscrutable handwriting."

not always in accord. The following facts come from the Magistrate's Recommendation to the district court, or are undisputed.

The magistrate then decided that two of Mr. Hollis' claims, those alleging ineffective assistance of counsel and denial of the right to appeal, were barred by Rule 9(a) of the Rules Governing Section 2254 Cases. The magistrate found that the passage of time and lack of a transcript prejudiced the state's ability to respond to these allegations, and that because Mr. Hollis had unreasonably delayed in bringing his *habeas* petition, these problems were properly charged to him . The magistrate thought that Mr. Hollis could have obtained counsel and filed for *habeas* much earlier, during one of his periods of release on parole in the 1970's.

Magistrate Carroll did not rely on Rule 9(a) in rejecting the other two grounds raised by Mr. Hollis. Finding no evidence that Mr. Hollis had been improperly sentenced by the judge rather than the jury, the magistrate rejected that claim on its merits.[2] He agreed with Mr. Hollis that blacks had been unconstitutionally excluded from the pool from which the grand jury was selected, but held that because Mr. Hollis had not shown that a properly selected grand jury would not have indicted him, he had not shown the prejudice necessary to excuse his failure to raise the issue at trial. The magistrate did not address Hollis' separate claim that he had been convicted by an unconstitutionally selected petit jury.

After the magistrate presented his Recommendation to the district court, Mr. Hollis filed objections, including an objection to the magistrate's failure to answer his petit jury claim. The respondents did not file objections. The district court adopted the Magistrate's Recommendation without comment, and dismissed the petition. On appeal, Mr. Hollis challenges each of the magistrate's conclusions except the one concerning improper sentencing. We address only the jury composition question because it is dispositive.

## II. Composition of the Bullock County Jury List

▆ The respondents do not seriously contest the finding that blacks were systematically excluded from the list from which grand and petit juries were chosen in 1959, nor do they rely on Rule 9(a) as grounds for denying relief on this claim. The magistrate's finding of discrimination is well supported.

Magistrate Carroll primarily relied on a 1968 decision by then-District Judge Johnson finding that Bullock County's jury list significantly underrepresented the black population, and was unconstitutional. *McNab v. Griswold*, No. 2653–N (M.D.Ala. Nov. 5, 1968). According to stipulated facts in that case, Bullock County's total population was 71.9% black and 27.1% white, and the population between the ages of 21 and 64, inclusive, was 64.5% black and 34.5% white, yet only 44% of the names on the jury list were names of black people. Judge Johnson held that this "unexplained disparity ... is constitutionally impermissible." *McNab*, slip op. at 3. Magistrate Carroll sensibly inferred that if the jury list underrepresented blacks in 1968, it must have underrepresented them in 1959.

This inference is justified. Judge Johnson's decision noted that of the 363 names of black people contained in the jury box in November, 1968, over half had been added after *McNab* was filed in March, 1968. Slip op. at 2. It is safe to conclude, therefore, that the jury box in 1959 contained even fewer names of black people than it did in 1968. Census data for 1960 (of which we take judicial notice, *see, e.g., Barber v. Ponte*, 772 F.2d 982, 998 (1st Cir.), *vacated on other grounds on reh'g en banc*, 772 F.2d at 994 (1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986)), confirm that blacks were a clear majority of the population in Bullock County, yet Mr. Hollis' defense attorney and the judge who presided over his case both testified that very few, if any, blacks served on juries. Neither man could remember any blacks being on the *venire* from which Mr. Hollis' jury was selected, and Mr. Hollis, who testified that he was present when the jury was chosen, said each member of the *venire* and the petit jury was white.

2. The jury was the proper sentencing authority under state law. 1940 Ala.Code, tit. 14, § 85.

The magistrate asked Mr. Jinks, the attorney who defended Mr. Hollis in 1959, whether there was "a statutory or a de facto prohibition against blacks on the jury back then?" Mr. Jinks answered, "Well, as I remember, Your Honor, there was just none in the jury box, or very few at that time." Later, the magistrate commented: "I think that, the sense that I get is that there just were no blacks on juries in Bullock County back in '59." Mr. Jinks responded: "I think you're right, Judge."

Because in Alabama grand and petit juries were selected from the same pool of potential jurors, 1940 Ala.Code, tit. 30, § 30, a finding that blacks were systematically excluded from the jury list means that both grand and petit juries were unconstitutionally composed.

### III. Exhaustion of State Remedies

■ The federal *habeas corpus* statute requires that a petitioner must exhaust available state remedies, or show "that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b). The record supports the magistrate's conclusion that Mr. Hollis need not exhaust his state remedies, because returning to state court would be futile.

Mr. Hollis testified, without contradiction, that he had made numerous *pro se* attempts to challenge his conviction in state court, including petitions for writs of error *coram nobis, mandamus* and *habeas corpus.* The magistrate found that Mr. Hollis had filed at least three petitions for relief in the Circuit Court of Bullock County, but that none of these was acted on by the court.

■ A federal *habeas* petitioner need not wait until his state petitions for relief are exhausted, if the state court has unreasonably or without explanation failed to address petitions for relief. *Cook v. Florida Parole and Probation Com'n,* 749 F.2d

678, 680 (11th Cir.1985) (*per curiam*). *St. Jules v. Beto,* 462 F.2d 1365, 1366 (5th Cir.1972) (*per curiam*). *Rheuark v. Wade,* 540 F.2d 1282, 1283 (5th Cir.1976) (*per curiam*) (a fifteen month delay could be unjustifiable and relieve a federal *habeas corpus* petitioner from the exhaustion requirement); *Breazeale v. Bradley,* 582 F.2d 5, 6 (5th Cir.1978) (state remedy ineffective and exhaustion excused where state *habeas* petition has been completely dormant for over one year, and state has offered no reason for delay). Mr. Hollis' most recent state *pro se* submission is indeed inscrutable.

This pleading is extensive. Although we are able to read some of the words, there are many we cannot, nor can we interpret the context to any degree of satisfaction. There are some words and phrases which suggest complaints that blacks were absent from the jury, that the defense attorney did not object to the jury, and that petitioner was denied effective assistance of an attorney, but it would be speculation to say that he was or was not endeavoring to state the same claims which are now before us, articulated here with the help of counsel. What is very clear is that Mr. Hollis needed assistance in order to make an intelligible written statement of his claims.

■ But the Bullock County Circuit Court has neither appointed a lawyer to represent Mr. Hollis,[3] nor dismissed his petition and the assistant attorney general representing the respondents could not assure Magistrate Carroll that Bullock County would appoint a lawyer to help him with state filings, if his federal petition was again dismissed for failure to exhaust state remedies. Without counsel, Mr. Hollis' submissions are sure to get nowhere. When a state admits the futility of further resort to its own courts, it waives the exhaustion requirement. *Thompson v. Wainwright,* 714 F.2d 1495, 1501 (11th Cir. 1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Lamb v. Jernigan,* 683 F.2d 1332, 1335 n. 1 (11th Cir.

---

**3.** Since 1963, Alabama has had a statute providing for the appointment of compensated counsel on post-conviction remedies, including habeas corpus and coram nobis, "if necessary to assert or protect the right of the person" incarcerated. Ala.Code § 15–12–23.

1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 497 (1983).

## IV. Procedural Bar

Had Mr. Hollis challenged the constitutionality of the grand and petit jury in 1959, and at appropriate stages of state review, and had such challenges been denied, he would now be entitled to have the writ issued. The systematic exclusion of blacks from the juries would require relief without a showing of actual prejudice from the errors. *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (*"Hillery"*) (grand jury); *Avery v. Georgia,* 345 U.S. 559, 561, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953) (petit jury); *Peters v. Kiff,* 407 U.S. 493, 505, 92 S.Ct. 2163, 2169–70, 33 L.Ed.2d 83 (1972) (plurality opinion) (petit jury). Mr. Hollis concedes, however, that because a challenge was not timely raised in the state trial court, he must show cause for not raising the issue, and actual prejudice from the error. *See Francis v. Henderson,* 425 U.S. 536, 542, 96 S.Ct. 1708, 1711–12, 48 L.Ed.2d 149 (1976); *Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508–09, 53 L.Ed.2d 594 (1977) (*"Sykes"*).

### A. Cause

■ If the petitioner's state-law procedural default was due to the ineffective assistance of counsel, or if "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," this is "cause" for the default. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (*"Carrier"*).[4] The ineffective assistance must be *constitutionally* ineffective, under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but the "objective factor[s] external to the defense" remain largely undefined. The Supreme Court in *Carrier* gave as examples interference by state officials with a petitioner's attempt to raise an issue, and a showing that the legal or factual basis for a claim was not reasonably available to counsel. *Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645 (citing *Brown v. Allen,* 344 U.S. 443, 486, 73 S.Ct. 397, 422, 97 L.Ed. 469 (1953); *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984)).

Mr. Hollis maintains that cause can be found in the deficient performance of Mr. Jinks, the lawyer who defended him in Bullock County. Mr. Jinks has no specific memory of his representation of Mr. Hollis, although he did testify that in 1959 he would not have attacked the racial composition of the jury *venire.* Mr. Jinks did not explain exactly *why* he never raised such challenges; he must have either been unaware of the right, or knew of it but did not raise a challenge for some reason or inadvertently. He testified as follows:

Q: [By Magistrate Carroll]: Mr. Jinks, back in 1959 would you ever, in representing a criminal defendant, have filed a motion attacking the racial composition of the venire?

A: No, sir.

Q: It just wasn't something that you or any other lawyer did at that time?

A: That's right. . . .

Q: [By Mr. Prude]: Back in 1959 when this case was tried do you know if it was illegal at that time for blacks to be excluded from the venire or from the jury?

A: Not that I recall that it was.

Q: Okay. There was never any cases that you knew that had been challenged on appeal in the Alabama Supreme Court or anywhere else?

A: No, sir.

Q: Okay. Was that routinely done back in those days?

A: Yes.

Q: Okay.

THE COURT: Routinely done, meaning the exclusion of blacks from the jury?

THE WITNESS: Yes, sir.

*Carrier,* 477 U.S. at 489, 106 S.Ct. at 2646. But the respondents do not challenge the magistrate's finding that returning to state court is futile.

---

**4.** The respondents briefly contend that Mr. Hollis cannot rely on the ineffective assistance of counsel as cause excusing the procedural default because he has not yet raised this as an independent issue on review in state court. *See*

Mr. Jinks seems to have been saying that he didn't challenge the racial composition of the jury list because he did not think in 1959 it was illegal systematically to exclude blacks from jury service. If so, he was mistaken. As early as 1880 the U.S. Supreme Court had held that statutes excluding blacks from petit and grand jury service violated the Equal Protection Clause, and that indictments and convictions by unconstitutionally composed juries could not stand. *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880); *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1880). It held the next term that discriminatory administration of facially fair jury selection laws was also unconstitutional. *Neal v. Delaware,* 103 U.S. 370, 26 L.Ed. 567 (1881).

*Norris v. Alabama* established a framework for challenging the systematic exclusion of blacks from juries. 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). As explicated in later cases, a criminal defendant could make out a *prima facia* case of discrimination by showing that a substantial number of black people lived in the relevant community, but they were absent or virtually absent from juries. The state would lose unless it could prove that this absence stemmed from something other than discrimination. Between 1935 and 1959, the Supreme Court reviewed at least nine state court convictions raising this issue, reversing the convictions in eight, of-

ten after a careful *de novo* review of the evidence.[5]

The Alabama Supreme Court also had decided numerous cases addressing challenges to the systematic exclusion of blacks from jury lists. In *Washington v. State,* 269 Ala. 146, 112 So.2d 179 (1959), issued six weeks before Mr. Hollis was tried, the Court acknowledged that

[i]n a long line of cases going back many years, the Supreme Court of the United States has held that a criminal defendant is denied the equal protection of the law guaranteed by the Fourteenth Amendment to the Constitution of the United States if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. Decisions of this court are to the same effect.

269 Ala. at 152, 112 So.2d 179 (citations omitted). The Court cited six earlier Alabama Supreme Court cases which had recognized the principle.[6]

True, the U.S. Supreme Court had not yet made clear that the intentional use of peremptory challenges to exclude blacks from trial juries was a violation of the Equal Protection Clause. *See Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Perhaps Mr. Jinks was thinking of this use of peremptory challenges when he testified. But Mr. Hollis' challenge in-

---

**5.** *Eubanks v. Louisiana,* 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), *reversing* 232 La. 289, 94 So.2d 262 (1957); *Reece v. Georgia,* 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955), *reversing & remanding* 211 Ga. 339, 85 S.E.2d 773 (violation of 14th Amendment to require challenge to grand jury composition before indictment); *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), *reversing* 154 Tex.Crim. 648, 216 S.W.2d 813 (1949); *Patton v. Mississippi,* 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947), *reversing* 201 Miss. 410, 29 So.2d 96; *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945), *affirming* 148 Tex.Crim. 523, 182 S.W.2d 723 (1944) (facts in record did not prove systematic exclusion); *Hill v. Texas,* 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942), *reversing* 144 Tex.Crim. 415, 157 S.W.2d 369; *Pierre v. Louisiana,* 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939), *reversing* 189 La. 764, 180 So. 630; *Hale v. Kentucky,* 303 U.S. 613, 58 S.Ct. 753, 82

L.Ed. 1050 (1938), *reversing* 269 Ky. 743, 108 S.W.2d 716 (1937); *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), *reversing* 229 Ala. 226, 156 So. 556 (1934).

*See also Martin v. Texas,* 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497 (1906); *Rogers v. Alabama,* 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904); *Carter v. Texas,* 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900), *reversing and remanding* 39 Tex.Crim. 345, 46 S.W. 236 (1898); *Gibson v. Mississippi,* 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896).

**6.** *Norris v. State,* 229 Ala. 226, 156 So. 556 (1934); *Vaughn v. State,* 235 Ala. 80, 81, 177 So. 553 (1937); *Millhouse v. State,* 232 Ala. 567, 569, 168 So. 665 (1936); *Vernon v. State,* 245 Ala. 633, 18 So.2d 388 (1944); *Fikes v. State,* 263 Ala. 89, 81 So.2d 303 (1955); *Reeves v. State,* 264 Ala. 476, 88 So.2d 561 (1956). *See also Collins v. State,* 234 Ala. 197, 198, 174 So. 296 (1937).

volves the systematic exclusion of blacks from the pool from which grand and petit juries were chosen. *This* right could hardly have been better established by 1959, and any competent attorney practicing criminal defense in Alabama at that time should have known of it.

If Mr. Jinks did not assert this right because he was unaware of it, his representation was not "within the range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). A Justice of the Alabama Supreme Court noted in 1963 that "it is beyond the realm of speculation that any active lawyer, practicing law and residing in Montgomery, could fail to know that the question of exclusion of Negroes from the juries in Montgomery County has been raised in recent years.... [I]t is inconceivable that any qualified and active local attorney would not know of the raising of the question...." *Ex parte Aaron*, 275 Ala. 377, 379, 155 So.2d 334, cert. denied, 375 U.S. 898, 84 S.Ct. 177, 11 L.Ed.2d 126 (1963) (Merrill, *J.*, concurring). Bullock County borders Montgomery County to the southeast. This ineffective assistance establishes cause for the procedural default.[7]

While Mr. Jinks was not totally clear as to why he did not challenge the jury composition, it is impossible to conclude from his statements that he had made a reasoned, professional judgment that not raising the issue was in Mr. Hollis' interest. Such a choice, if exercised in light of the specific facts of the case, and with an informed estimate of the merits of the particular challenge, can be charged to the defendant, and the right waived. *Gates v. Zant*, 863 F.2d 1492, 1498–99 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989); *Winters v. Cook*, 489 F.2d 174, 180 (5th Cir.1973) (*en banc*). *See Lancaster v. Newsome*, 880 F.2d 362, 375–76 (11th Cir.1989) (no cause for default shown when counsel did not raise jury chal-

lenge for strategic reasons and because he felt it was meritless). *See also Birt v. Montgomery*, 725 F.2d 587 (11th Cir.) (*en banc*), *cert. denied*, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984). Mr. Jinks testified that he *never* made such challenges, so his failure to do so, even if he knew of the right, cannot be imputed to Mr. Hollis.

There is a third possibility: that Mr. Jinks knew of the right, but didn't raise it out of fear for his own practice and reputation. Such a motivation would not have been unusual at the time. A contemporaneous Fifth Circuit case noted that, due to the threat of "loss of practice and social ostracism," there was widespread reluctance among defense lawyers to challenge the exclusion of blacks from jury rolls. *United States v. Harpole*, 263 F.2d 71, 82 (5th Cir.), *cert. denied*, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959). *See also Whitus v. Balkcom*, 333 F.2d 496 (5th Cir.), *cert. denied*, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); *Winters*, 489 F.2d at 187 & n. 7 (Rives, *J.*, dissenting); *id.* at 191 (Godbold, *J.*, dissenting); Note, Negro Defendants and Southern Lawyers: Review in Federal Habeas Corpus of Systematic Exclusion of Negroes from Juries, 72 Yale L.J. 559, 565–68 (1963).

The court in *Harpole* and *Whitus* held that if a challenge was not brought because of the defense attorney's personal fears, the defendant had not voluntarily waived the right to a constitutionally selected grand and petit jury and could assert that right on federal review. By 1973 a majority of the Fifth Circuit no longer was willing to *presume* that the failure of a white Southern lawyer representing a black defendant to challenge the racial composition of jury lists was due to social pressure, but it did recognize that when such was in fact the case, a holding of waiver is inappropriate. *Winters*, 489 F.2d at 178–79; *id.* at 187 & n. 7 (Rives, *J.*, dissenting); *id.* at 191 (Godbold, *J.*, dissenting).

---

7. Of course, inadequate representation is only one of two components of constitutionally ineffective counsel; the inept representation also must have prejudiced the accused's defense.

*Strickland*, 466 U.S. at 687, 691–92, 104 S.Ct. at 2064, 2066–67. We defer discussing the prejudice component until we reach it in dealing with avoidance of the procedural bar.

More recently, this court affirmed that this principle applies in the "cause" component of *Francis* and *Sykes*. In *Goodwin v. Balkcom*, 684 F.2d 794, 805–07 (11th Cir. 1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983), the lawyer who had represented a federal *habeas* petitioner at his state trial explained that he did not object to the racial composition of the grand and petit jury lists because "I didn't think it would be to any avail," and because "I'm a native of this part of the country and I just don't think about the thing." He also admitted that he might have faced hostile social pressure had he raised a challenge, and that he feared for his professional and social reputation, being an appointed lawyer representing a black man charged with a capital offense.[8] The court stated in dictum that such reasons would be a cause for the failure to raise the issue. *Id.* at 809 n. 17.

Thus, even if Mr. Jinks' representation was not constitutionally ineffective under *Strickland,* if he did not object to the racial composition of the county's jury list out of fear of community reaction or loss of practice, such failure is an "objective factor external to the defense" which is "cause" for the procedural default. *See Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645.

In relying on ineffective assistance of counsel as cause for failure to challenge the racial composition of the jury, we are mindful of the admonition in *Carrier*, 477 U.S. at 489, 106 S.Ct. at 2646, that "the exhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." [Citation omitted.]

Significantly, as the Supreme Court implied by prefacing this rule with "generally," and as 28 U.S.C. § 2254(b) makes explicit, exceptions exist to the exhaustion requirement, *i.e.*, when "there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the right of the prisoner." *See Howard v. Davis*, 815 F.2d 1429, 1430 (11th Cir.), *cert. denied*, 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 136 (1987) ("Futility of exhaustion is recognized in this circuit as an exception to the exhaustion requirement of § 2254(b).").

Given the particular facts of this case, where petitioner is unable, without assistance, to articulate his claims in writing, has made several attempts to present claims to the state courts, counsel has not been appointed, nor is there any assurance counsel would be supplied on another attempt, we are satisfied it would be futile for Hollis to return to state court and attempt, without assistance, to raise the racial exclusion claim and an ineffective assistance of counsel claim. The reason in this case for deeming the attempt futile applies equally to the assistance of counsel claim and to the claim of discriminatory jury selection itself.

### B. Prejudice

*Francis* established that state prisoners seeking federal *habeas* relief, like federal prisoners seeking collateral review under 28 U.S.C. § 2255, must show cause and actual prejudice before raising an issue procedurally defaulted in state proceedings. 425 U.S. at 542, 96 S.Ct. at 1711–12. The underlying constitutional error alleged in *Francis* was racial discrimination in the selection of grand juries. Although *Hillery* and *Avery* established a rule of automatic reversal for such violations in the absence of a procedural bar, the Court declined to presume prejudice, once cause was shown, in order to overcome a procedural bar. "The presumption of prejudice which supports the existence of the [constitutional] right is not inconsistent with a holding that actual prejudice must be shown in order to obtain relief from a statutorily provided waiver for failure to assert it in a timely manner." *Francis*, 425 U.S. at 542 n. 6, 96 S.Ct. at 1711 n. 6

---

**8.** It is likely that Mr. Jinks, too, was appointed. While Mr. Jinks could not remember if he was appointed or retained, Mr. Hollis testified that he was appointed. Alabama law provided for the appointment of counsel in capital cases. 1940 Ala.Code, tit. 15, § 318.

(quoting *Davis v. United States*, 411 U.S. 233, 245, 93 S.Ct. 1577, 1584, 36 L.Ed.2d 216 (1973)).

The "precise content" of "prejudice" was left for development in later cases. *Sykes*, 433 U.S. at 91, 97 S.Ct. at 2508–09. "The terms 'cause' and 'actual prejudice' are not rigid concepts; they take their meaning from the principles of comity and finality.... In appropriate cases those principles must yield to the imperative of correcting a fundamentally unjust incarceration." *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1575–76, 71 L.Ed.2d 783 (1982). "[T]he burden of justifying federal *habeas* relief for state prisoners is greater than the showing required to establish plain error on direct appeal. *Henderson v. Kibbe*, 431 U.S. 145, 154 [97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203] (1977); *United States v. Frady*, [456 U.S. 152, 166, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982)]." *Id.*

■ To establish actual prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596 (emphasis in original) (decided same day as *Engle v. Isaac*).

■ A petitioner shows prejudice due to ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 694, 693, 104 S.Ct. at 2067–68. We conclude that we must determine whether in this case there is a probability of a different result sufficient to undermine confidence in the outcome.

■ The systematic exclusion of blacks from jury eligibility has been recognized as skewing the judicial process against black defendants. In *Hillery*, the Supreme Court noted that (in the absence of procedural default) a defendant indicted by a grand jury from which blacks had been excluded was entitled to be released, not just to vindicate the right, but to safeguard the defendant from the possibility of prejudice. 474 U.S. at 263, 106 S.Ct. at 623. Justice Jackson noted the same in regard to trial juries:

> It is obvious that discriminatory exclusion of Negroes from a trial jury does, or at least may, prejudice a Negro's right to a fair trial.... The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding, it is influenced by imponderables—unconscious and conscious prejudices and preferences—and a thousand things we cannot detect or isolate in its verdict and whose influence we cannot weigh.... A trial jury on which one of the defendant's race has no chance to sit may not have the substance, and cannot have the appearance, of impartiality, especially when the accused is a Negro and the alleged victim is not.

*Cassell v. Texas*, 339 U.S. 282, 301–02, 70 S.Ct. 629, 638–39, 94 L.Ed. 839 (1950) (Jackson, *J.*, dissenting).

The effect of the exclusion of blacks from the jury list in Bullock County in 1959 was not small; census data show it must have created a fundamental distortion in the racial composition of grand and petit juries. The 1960 census shows that blacks constituted the majority of the county's population in 1960, outnumbering whites by more than two to one. 1960 Census of Population, General Population Characteristics, Alabama, ("1960 Census") at 2–92. Nevertheless, undisputed testimony established that no blacks were serving on juries in that county in 1959. As discussed below, if not for this discrimination, it is highly probable that blacks would have served on the grand jury which was asked to indict Mr. Hollis, and on the petit jury which tried him.

Alabama law made presumptively quali-

fied for jury service all male[9] citizens of the county at least twenty-one years old "who are generally reputed to be honest and intelligent men and are esteemed in the community for their integrity, good character and sound judgment...." 1940 Ala. Code, tit. 30, § 21 (1959). No one could serve "who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or cannot read English or who has ever been convicted of any offense involving moral turpitude." *Id.* An otherwise qualified "freeholder or householder" who could not read English could serve, and those over age sixty-five served only if willing. *Id.*

Of the men twenty-one years and older living in Bullock County in 1960, 63% were black, and 37% were white. (61% of the men aged twenty-one through sixty-four were black and 39% were white.) 1960 Census at 2–75. The jury selection statute in terms stated that all those qualified for jury service were to be placed on the jury list. Tit. 30, § 21. Because the record contains no evidence that in 1959 the black men of Bullock County were less likely to be qualified to serve on juries than white men, we may assume that a properly compiled jury list should have roughly approximated the racial composition of this group.

According to contemporary Alabama law, grand juries were selected as follows: In open court, a group of not less than fifty names was selected from a box which contained all the names found on the jury list. After granting exemptions to those entitled, the presiding judge would randomly select eighteen names from those remaining. These people would serve as the grand jury for that term, and from the remaining names would be drawn any petit juries needed for non-capital cases. Tit. 30, §§ 38, 30. The record shows no reason that otherwise qualified blacks were more likely to be entitled to exemptions than whites, so even assuming some variation due to chance and other factors, it seems highly probable that a properly composed grand jury would have contained at least a number of blacks, perhaps even a majority of them.

The petit jury in capital cases was selected from a special *venire*, consisting of from fifty to one hundred people and "including those drawn on the regular juries for the week set for the trial of the case." Tit. 30, § 63. From this special *venire*, the prosecution and defendant would alternately strike names from the *venire* list, the defendant striking two for each strike of the prosecution. Again, even assuming some variation due to chance, it is probable that had blacks not been excluded from the jury list, at least some would have served on Mr. Hollis' petit jury.[10]

Evidence before the magistrate confirms that the discrimination against blacks had had a significant effect on the composition of juries in Bullock County. The petit jury in Mr. Hollis' case was all white, while the judge who presided over his trial testified in 1987 that "actually it's been many years since I remember almost a white being on a jury in Bullock County. It's all black now." The proportion of blacks in Bullock County has actually declined slightly since 1960,[11] so the recent notable service of

---

9. The exclusion of women from jury service had not yet been declared unconstitutional. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

10. This is true even if the prosecution used all of its challenges to strike blacks who appeared on the special venire. Of the fifty-eight names which appeared on Mr. Hollis' special venire, forty-six would be struck to produce a jury of twelve, with the prosecution striking fifteen or sixteen of those, depending on who strikes first. Had the jury list reflected the racial distribution of those available for jury service, at least 61% of the names would have been of black men. Ignoring variation due to chance, thirty five names on the jury venire would have been of black men. If the prosecution used every strike to eliminate a black venireman, at least twenty would remain. Even allowing for chance variation in the number of blacks which appear on the special venire list, it is probable that a number of blacks would have served on a properly composed jury.

11. In 1960, Bullock County's population was 71.9% black and 28.1% white. 1960 Census at 2–92. In 1970, blacks were 67.4% of the county's population, and were 67.6% in 1980. 1970 Census of Population, Characteristics of the Population, Alabama at 2–44; 1980 Census of

blacks on juries is almost certainly due to the elimination of discrimination in jury selection. Because it is so likely that the make-up of the grand and petit jury would have been different had Bullock County not discriminated against blacks in assembling its jury list, we cannot say with confidence that the outcome of Mr. Hollis' case would have been the same.

Mr. Hollis was indicted and convicted by all white juries which were the product of an unconstitutional, racially discriminatory process of selection. Moreover, in Bullock County, Alabama, proper selection would very probably, almost certainly, have produced juries with some members of Mr. Hollis' own race. Thus, there would have been an actual difference between the racial composition of juries properly selected, and that of the juries which indicted and tried Mr. Hollis.

In *Strickland* terms, if we compared the result reached by an all white jury, selected by systematic exclusion of blacks, with the result which would have been reached by a racially mixed jury, we would have greater confidence in the latter outcome, finding much less probability that racial bias had affected it. This principle was recognized in *Huffman v. Wainwright,* 651 F.2d 347, 350 (5th Cir. Unit B July 1981):[12]

> Huffman was a black man accused of raping a white woman. A mixed-race jury might clearly have a special perception in a mixed race case. His defense was consent. His jury was all white. Although a constitutionally drawn jury may be all white, or all black, depriving Huffman of the chance of having a mixed-race jury would seem to meet the prejudice requirements for relief. Cf. *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

*See also Spencer v. Zant,* 715 F.2d 1562, 1575–76 (11th Cir.1983) (underrepresentation of blacks and women on jury lists "appears" to satisfy actual prejudice requirement, where petitioner has alleged blacks and women are less likely to convict a defendant and recommend the death penalty).

The assessment of the probability of a different outcome, but for the unconstitutional jury selection, must be made in this case at three levels:

(1) Would a properly selected grand jury with black members have been less likely to indict Mr. Hollis?

(2) Would a properly selected petit jury have been less likely to convict him?

(3) Would the jury, having convicted Mr. Hollis and being given a range of possible imprisonment starting as low as ten years, have been less likely to impose imprisonment as long as 99 years?

The record before us does not show very much about the facts of the criminal case. The indictment charged Mr. Hollis with entry of a dwelling in the nighttime with intent, in the alternative, to steal, rob, or murder. Testimony before the magistrate indicated that someone had entered a dwelling at night and severely beaten its occupant, who was white. Some of the witnesses called by the state had testified at trial that Mr. Hollis did it. There had been defense testimony that Mr. Hollis was in Birmingham, out of the county, at the time of the offense. The victim had not testified. Mr. Hollis testified before the magistrate that during the jury deliberation, two of the jurors had come into court and asked the judge, "How much time can we give him, 10 to 20 years?"

The magistrate concluded that actual prejudice had not been shown to have resulted from the unconstitutional composition of the grand jury. Had the indictment been quashed, and the grand jury properly selected, Mr. Hollis would probably have been re-indicted. There were witnesses who testified against Mr. Hollis at trial, and it is quite likely their testimony was sufficient to demonstrate probable cause. We have no objective reason for concluding

---

Population, General Population Characteristics, Alabama at 2–15.

12. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981).

that a grand jury containing black members would probably have refused to indict or have charged a lesser offense. The court has held that where the evidence was "so overwhelming that there is no question that he would have been re-indicted," the petitioner has suffered no prejudice. *Godfrey v. Kemp*, 836 F.2d 1557, 1570 (11th Cir.), *cert. dismissed*, 487 U.S. 1264, 109 S.Ct. 27, 101 L.Ed.2d 977 (1988); *Francois v. Wainwright*, 741 F.2d 1275, 1283 (11th Cir.1984). Like the magistrate, we find no actual prejudice resulting from the unconstitutional selection of the grand jury.

■ For some reason, the magistrate did not deal with the question of prejudice resulting from trial by an all white, unconstitutionally selected jury rather than a racially mixed, properly selected one. Because there is no transcript, we are unable to make the kind of judgment of probabilities which a court often makes when called upon to decide whether a trial error is or is not harmless. It is conceivable that a transcript could show a case against Mr. Hollis so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit.

We do not think that it is fair, however, to hold Mr. Hollis responsible for the lack of a transcript, nor to assume that the transcript would have demonstrated a state case of that strength.

Mr. Hollis testified, without contradiction, that he filed a *coram nobis* petition with the state court two years after his conviction, and that he filed a motion specifically seeking a transcript in 1964. Magistrate Carroll found that he filed "further petitions" in state court in 1966 and 1972. There is no evidence, and the state does not claim, that it responded to any of these petitions in any meaningful way. Counsel was not appointed to guide Mr. Hollis through state collateral review, and the Bullock County Circuit Court did not give consideration to the merits of any of his *pro se* submissions. The state and the state court appear to have ignored these early attempts to challenge his conviction and sentence at a time when a transcript likely could have been produced.

■ Finally, as already indicated, even if prejudice has not been demonstrated in the jury's decision to convict rather than acquit, there is the further question of prejudice in the jury's sentencing Mr. Hollis to 99 years imprisonment when it could have sentenced him to a shorter term, as little as ten years. Choosing a sentence from a broad range of possibilities is different from deciding guilt or innocence; it involves even more of the subjective "imponderables" referred to by Justice Jackson in *Cassell v. Texas*. There was testimony before the Magistrate that an inquiry had been addressed to the court which indicated that the jurors gave some consideration to a sentence as low as 10 to 20 years. We would have far more confidence in a term of imprisonment selected by a jury containing members of the defendant's own race, particularly where the black defendant is on trial for an offense against a white person.

As we noted earlier, " '[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' " *Carrier*, 477 U.S. at 495, 106 S.Ct. at 2649 (quoting *Engle*, 456 U.S. at 135, 102 S.Ct. at 1576).

We conclude that, at least as to sentencing, there is a probability of a different result, but for the unconstitutional jury selection, sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Clearly, the improperly selected jury "infect[ed] his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596.

## V. Conclusion

Mr. Hollis has demonstrated both cause and prejudice. At oral argument, counsel for the state agreed that it is not in a position to re-try Mr. Hollis, and that if there is to be reversal, he should be released forthwith. We reverse the judgment of the district court and remand with directions to grant the writ of *habeas cor-*

*pus,* and to order the state to release Mr. Hollis immediately.

REVERSED and REMANDED with directions.

RONEY, Senior Circuit Judge, dissenting:

I respectfully dissent. I would affirm for the reasons set forth in the magistrate's recommendation, which was adopted by the district court.

O.P. Hollis was convicted in 1959. He was paroled in March 1970, again in May 1973, and for a third time in May 1977. Parole was revoked each time, and most recently in June 1978. He did not file a federal petition for writ of habeas corpus until 1981.

By that time, none of the key players in that 1959 trial could recall it clearly. The presiding judge remembered nothing about the case. The prosecution witnesses were all either quite elderly or deceased. Defense counsel had long since discarded his notes and could no longer remember much about the case, including why he did or did not do certain things in his client's defense. No transcript had ever been prepared and the state no longer had any records from which a transcript could be made. Indeed, the only records produced at the evidentiary hearing were copies of the docket sheet, arrest warrant, indictment, and jury list.

Rule 9(a) of the Rules Governing Section 2254 Cases was specifically designed to apply to situations such as this where a lengthy pre-filing delay prejudices the Government's ability to respond to the allegations. The rule provides:

> A petition may be dismissed if it appears that the state ... has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

The petitioner has not alleged facts which would permit the application of the exception in this rule. There is no evidence in the record to support the defendant's allegations, it being necessary to rest on presumptions and speculation to reach a favorable result for defendant. *See Henson v. Estelle,* 641 F.2d 250, 253 (5th Cir. Unit A March 1981) (habeas relief may not be granted on assumptions). At this time, it is simply impossible for the state to show that the strength of its 1959 case against petitioner precludes a finding of prejudice from the procedural default.

I would affirm the district court's judgment.