**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STANLEY WILLIAMS,
        *Petitioner-Appellant,*

v.

JEANNE WOODFORD, Warden,
California State Prison at San
Quentin,
        *Respondent-Appellee.*

Nos. 99-99018
        00-99001

D.C. No.
CV-89-00327-SVW

ORDER

Filed February 2, 2005

Before: Procter Hug, Jr., Thomas G. Nelson, and
Ronald M. Gould, Circuit Judges.

Order;
Dissent by Judge Rawlinson

## ORDER

The panel has voted to deny the petition for panel rehearing. Judge Gould has voted to reject the suggestion for rehearing en banc and Judges Hug and T.G. Nelson have so recommended.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are DENIED.

1315

RAWLINSON, Circuit Judge, with whom PREGERSON, REINHARDT, THOMAS, WARDLAW, W. FLETCHER, FISHER, PAEZ, and BERZON, Circuit Judges join, dissenting from denial of rehearing en banc:

In this case, a prosecutor, publicly castigated by the Supreme Court of California for his pattern of racially motivated peremptory jury challenges, removed all blacks from Williams' jury. In declining to take this case en banc, our court bestows an implicit imprimatur upon the trial court's denial of a constitutionally mandated jury selection process.

In my view, the panel opinion contains two errors: (1) failure to issue a certificate of appealability (COA) to Williams despite his satisfaction of the standard for the grant of a COA, and (2) misapplication of the standard of proof to establish a prima facie case of *Batson* error. By increasing the burden of proof necessary to make a *Batson* prima facie showing, the panel cleared the way for attorneys "who are of a mind to discriminate" by exercising their peremptory challenges to excise prospective African-American jurors from the jury box. *Batson v. Kentucky*, 476 U.S. 79, 96 (1986).

I dissent from the denial of rehearing en banc not only because every defendant is entitled to a jury that is unbiased and untainted by racial discrimination in the jury-selection process, but also because the very legitimacy of our system of justice depends upon continued vigilance against such practices.

## I.   A COA on Williams' *Batson*  Claim Should Have Been Issued

In 1981, Williams was convicted of murder and sentenced to death by an all-white jury. During jury selection, the prosecutor used peremptory challenges to strike all three African-Americans who would otherwise have sat on the jury or in the alternate juror pool. Without explanation or tactical justifica-

tion, Williams' trial counsel failed to object to this violation of his client's constitutional rights, even though he later acknowledged that he was aware of applicable California law prohibiting the practice and that he could have made a meritorious objection.

Williams argues that the prosecutor engaged in impermissible racial discrimination in the jury selection process in violation of the Equal Protection Clause. He also argues that his counsel's failure to object to this constitutional violation constituted ineffective assistance of counsel.

The district court denied Williams' habeas petition, granting summary judgment for the state on both the *Batson* claim and the related ineffective assistance of counsel claim without conducting an evidentiary hearing, and then denied Williams' discovery request as moot.

Williams appealed to this court, but the panel did not grant a COA on the *Batson* claim, and our court as a whole declined Williams' request to review that denial. The panel also failed to address the question of whether trial counsel's failure to object to the prosecutor's discriminatory peremptory challenges gives rise to an ineffective assistance of counsel claim.

The panel opinion concluded that Williams failed to make the "substantial showing of the denial of a constitutional right" necessary to warrant a COA because he did not make a prima facie showing of a violation. *Williams v. Woodford*, 384 F.3d 567, 584 (9th Cir. 2004) (as amended Sept. 9, 2004) (*Williams I*).

Unfortunately, this holding represents a fundamental misapplication of the standards set by the Supreme Court, this circuit, and other circuits regarding: 1) what evidence is *sufficient* to establish a prima facie case under *Batson*; 2) what evidence is *relevant* to the making of a prima facie case; 3) what kind of evidence is *necessary* to establish a prima facie

case; and 4) what showing is sufficient to warrant a COA on a *Batson* claim.

Because of the profound importance of *Batson* to African-Americans and, indeed, all Americans who cherish justice, I spell out the jurisprudence in this area, hoping to impel a much-needed focus on our solemn obligation to provide color-blind tribunals.

## A.   Prima Facie Showing of a Batson Violation

Although the panel correctly noted that to make a prima facie showing under *Batson*, Williams must show that the facts and circumstances of the jury selection create an inference of discrimination by the prosecutor, the opinion does not incorporate any analysis of the cogent facts presented by Williams, and the inference of discrimination compelled from those facts. Instead, the panel apparently imposed a requirement that Williams present *additional* evidence not required by *Batson*.

The striking of even a single juror based on race violates the Constitution. *See, e.g.*, *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). In this case, the prosecutor struck three African-American prospective jurors. Specifically, the prosecutor used two of his nineteen peremptory challenges to remove the only two African-Americans who had been drawn, passed for cause, and placed in the jury box and who otherwise would have served on the jury. He also used one peremptory challenge to remove the only African-American who had been drawn as an alternate juror. As a result, the prosecutor obtained a jury, and an alternate juror pool, that contained not a single African-American.

The facts of Williams' jury selection are remarkably similar to those considered by the Court in *Batson* itself: in *Batson*, "[t]he prosecutor used his peremptory challenges to strike all

four black persons on the venire, and a jury composed only of white persons was selected." *Batson*, 476 U.S. at 83.

To discount the significance of the prosecutor's removal of the African-American jurors in this case, the panel relies on *Vasquez-Lopez*, 22 F.3d at 902, where we "stated that [u]sing peremptory challenges to strike Blacks does not end the prima facie inquiry; it is not per se unconstitutional, without more, to strike one or more Blacks from the jury. A district court must consider the relevant circumstances surrounding a peremptory challenge." *Williams I*, 384 F.3d at 584 (alterations and internal quotation marks omitted). In *Vasquez-Lopez*, one black was struck. The defendant was Latino. The district court appropriately examined the surrounding circumstances. In this case, by contrast, the relevant circumstances actually strengthen the inference of discrimination raised by the prosecutor's pattern of strikes against African-Americans.

Although the fact that a prosecutor struck one or more African-Americans from the jury may be insufficient in and of itself to create an inference of discrimination, when a prosecutor's use of peremptory challenges results in the exclusion of *all* of the African-American jurors summoned to the jury box, it creates an inference of discrimination sufficient to constitute a prima facie showing of a *Batson* violation. *See, e.g.*, *United States v. Chinchilla*, 874 F.2d 695, 698 & n.4 (9th Cir. 1989) (finding significant the fact that "all the Hispanic jurors were challenged" in concluding that defendants made prima facie showing of *Batson* violation where prosecutor peremptorily challenged only two minority jurors, one of whom was merely an alternate); *Riley v. Taylor*, 277 F.3d 261, 275-76 (3rd Cir. 2001) (finding prima facie showing where striking of three prospective jurors resulted in all-white jury).[1]

---

[1] Although Williams alleges that the prosecutor's exercise of peremptory strikes produced an all-white jury, Respondent argues that Williams did not make a prima facie showing because one of the seated jurors may not have been white. Respondent disputes the race of this juror despite

Added to the fact that the prosecutor used his peremptory challenges to eliminate all African-Americans from the jury and the alternate juror pool, the "relevant circumstances" supporting an inference of discrimination in this case include the following: the prosecutor struck jurors who were of the same race as the defendant, the victims were of a different race, and the case was one in which the jury would be asked to consider imposing the death penalty. *See United States v. Clemons*, 843 F.2d 741, 748 (3rd Cir. 1988) ("When assessing the existence of a prima facie case, trial judges should examine all relevant factors, such as: how many members of the 'cognizable racial group' . . . are in the panel; the nature of the crime; and the race of the defendant and the victim."). In establishing his prima facie case, Williams is also "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Batson*, 476 U.S. at 96; *see also Chinchilla*, 874 F.2d at 697 n.3. Thus, taken together, all of the "facts and circumstances" surround-

---

Respondent's own admissions that a juror testified that he could not recall any minorities on the jury, and that the evidence Respondent offered to show that one juror was not white was, at best, "inconclusive as to race." Respondent's argument is unconvincing for, in addition to Respondent's own admissions, Williams' trial counsel explained in a sworn declaration that he was dissatisfied with the ultimate composition of the jury because it did not represent a fair cross-section of the community and that he should have objected "in order to have the prosecutor justify his removal of the black jurors." Moreover, even if one juror of a non-white ethnicity, or even one African-American juror, was left on the jury, the facts would still establish a prima facie case under *Batson*. *See, e.g.*, *Paulino v. Castro*, 371 F.3d 1083, 1091-92 (9th Cir. 2004) (use of peremptory challenges to excuse five out of six possible African-American jurors raised inference of discrimination; case remanded to district court for evidentiary hearing); *Palmer v. Estelle*, 985 F.2d 456, 458 (9th Cir. 1993) (holding that the fact that prosecutor did not attempt to remove all black jurors is not dispositive); *cf. Montiel v. City of Los Angeles*, 2 F.3d 335, 340 (9th Cir. 1993) (noting that the presence of one minority on the jury may weigh against the defendant's prima facie showing but explaining that "it does so *only nominally*" (emphasis added)).

ing the prosecutor's pattern of strikes against African-American jurors at Williams' trial establish a prima facie *Batson* claim.

Although the panel acknowledged that the "substantial showing requirement for a COA is relatively low," and that any doubt is to be resolved "in the petitioner's favor," *Williams I*, 384 F.3d at 583 (citations and internal quotation marks omitted), unfortunately, these precepts were honored only in their breach.

*B. The Relevance of Pattern-or-Practice Evidence to Making a Prima Facie Showing*

Williams presented evidence in the district court that the prosecutor in his case had a pattern and practice of discriminating on the basis of race in the exercise of peremptory challenges. Specifically, Williams points to two California Supreme Court cases that involved the *same* prosecutor whose actions are at issue here: *People v. Turner*, 42 Cal. 3d 711, 714 (1986), and *People v. Fuentes*, 54 Cal. 3d 707 (1991). All three cases, *Turner*, *Fuentes*, and this case, involved an African-American or Latino defendant on trial in a capital case. Although Williams does not need this pattern-or-practice evidence to make out his *Batson* claim, this evidence buttresses his prima facie case and makes even more clear that issuance of a COA was warranted.

The *Turner* trial took place prior to Williams' trial: Turner was sentenced to death in 1980, and Williams' trial commenced in February, 1981. The California Supreme Court reversed the judgment in *Turner* because "the prosecution failed to sustain its burden of showing that the challenged prospective jurors were not excluded because of group bias, and . . . the court failed to discharge its duty to inquire into and carefully evaluate the explanations offered by the prosecutor." *Turner*, 42 Cal. 3d at 728 (citations omitted). The facts and circumstances of the *Turner* jury selection are remarkably

similar to the *Williams* jury selection, but with one difference (Williams' counsel did not object):

> At the time of the crimes defendant was a young Black man on parole. The two persons he was accused of murdering were White, and both were well known and respected members of the community. At least three Blacks were in the venire summoned to hear the case; all three were called to the jury box, examined, and passed for cause. The prosecutor then struck all three Blacks from the jury by peremptory challenge. Defendant objected vigorously but in vain: the jury that ultimately tried him was all White.

*Turner*, 42 Cal. 3d at 715. After examining the prosecutor's proffered explanations for his strikes, the court found "ample reason to suspect" that they were "not bona fide." *Id.* at 721-29. The court ultimately concluded that "[t]he record demonstrated] that the prosecutor used his peremptory challenges to strike Black prospective jurors in a racially discriminatory manner for the apparent purpose of obtaining an all-White jury to try this Black defendant for crimes against White victims." *Id.* at 714.

The *Fuentes* trial took place a few years after Williams' trial. *See Fuentes*, 54 Cal. 3d at 722. The California Supreme reversed the judgment in *Fuentes* because the trial court failed to conduct the requisite evaluation after it impliedly found that the defense had established a prima facie case of racially discriminatory jury challenges by the prosecutor and expressly characterized some of the prosecutor's proffered excuses as "totally unreasonable" and others as "very spurious." *Fuentes*, 54 Cal.3d at 713. Although the reversal technically turned on the trial court's error in assessing the defendant's jury discrimination claim, Justice Mosk noted in his concurrence:

Nevertheless, I believe that we must place the ultimate blame on its real source — the prosecutor. It was he who unconstitutionally struck Black prospective jurors. The record compels this conclusion and permits none other. This was no "technical" or inadvertent violation. This prosecutor *knew* that such conduct was altogether improper. The trial court told him as much. And so did we. Only a few months earlier, in *People v. Turner* (1986) 42 Cal. 3d 711, this court attempted to teach this same prosecutor that invidious discrimination was unacceptable when we reversed a judgment of death because of similar improper conduct on his part. He failed — or refused — to learn his lesson. The result is another reversal — and another costly burden on the administration of justice.

*Fuentes*, 54 Cal. 3d at 722 (emphasis in original).

In short, this same prosecutor discriminated against African-Americans in his exercise of peremptory challenges before Williams' trial, and he continued to engage in this reprehensible and unconstitutional practice after Williams' trial. We simply cannot, as the panel did, dismiss the circumstances revealing the prosecutor's pattern and practice of racial discrimination as "irrelevant because they are not 'the circumstances concerning the prosecutor's use of peremptory challenges' at Williams's trial." *Williams I*, 384 F.3d at 584 (quoting *Batson*, 476 U.S. at 97). To do so turns *Batson* on its head.

In *Batson*, the Court explained that under *Swain v. Alabama*, 380 U.S. 202 (1965), "a black defendant could make out a prima facie case of purposeful discrimination on proof that the peremptory challenge system as a whole was being perverted" to strike blacks for racial reasons. *Batson*, 476 U.S. at 80.

> For example, an inference of purposeful discrimina-
> tion would be raised on evidence that a prosecutor,
> in case after case . . . is responsible for the removal
> of Negroes who have been selected as qualified
> jurors . . . and who have survived challenges for
> cause, with the result that no Negroes ever serve on
> petit juries.

*Id.* at 91-92 (citation omitted). After acknowledging that requiring "proof of repeated striking of blacks over a number of cases . . . has placed on defendants a crippling burden of proof, [and rendered] prosecutors' peremptory challenges . . . largely immune from constitutional scrutiny," *id.* at 92-93, the Court held that defendants "*may* establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial," *id.* at 96 (emphasis added). In its holding, the Court urged courts to be flexible in their view of what kinds of evidence could constitute a prima facie showing. *Id.* at 97-98. Given the fact that "[t]he reality of practice, amply reflected in many state- and federal-court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors . . . , [the Court] requir[ed] trial courts to be sensitive to the racially discriminatory use of peremptory challenges." *Id.* at 99. Thus, the purpose of *Batson* was to *lower* the bar for establishing a prima facie case and to *open* the door to different methods of proving racial discrimination in the jury selection process. *See generally*, *id.*; *see also*, *Paulino*, 371 F.3d at 1092 ("*Batson*'s inference standard was intended significantly to reduce the quantum of proof previously required of a defendant who wished to raise a claim of racial bias in the jury selection procedure, and thus is not onerous." (citations and internal quotation marks omitted)).

Nothing in *Batson* changed the fact that *Swain* pattern-or-practice evidence creates an inference of purposeful discrimination, and nothing in *Batson* can be construed as holding that

such evidence is irrelevant. Rather, *Batson* merely held that *other* kinds of evidence were *also* sufficient to establish a prima facie case of racial discrimination in the exercise of peremptory challenges. *Batson* lessened, not increased the burden of establishing a prima facie case.

Indeed, the Court has made clear the continuing relevance of pattern-or-practice evidence in cases following *Batson.* In *Ford v. Georgia*, 498 U.S. 411 (1991), the Court explained:

> Because *Batson* did not change the nature of the violation recognized in *Swain*, but merely the quantum of proof necessary to substantiate a particular claim, it follows that a defendant alleging a violation of equal protection of the law under *Swain* necessarily states an equal protection violation . . . subject to the more lenient burden of proof laid down in *Batson*.

*Id.* at 420.

In *Miller-El v. Cockrell*, 537 U.S. 322 (2003) ("*Miller-El I*"), the Court considered both evidence specific to the petitioner's trial and *Swain* pattern-or-practice evidence in determining that the Fifth Circuit should have granted a COA on the petitioner's *Batson* claim. *Id.* at 340-47. The Court specifically noted that "in our threshold examination, we accord some weight to petitioner's historical evidence of racial discrimination by the District Attorney's Office . . . presented at the *Swain* hearing." *Id*. at 346. As the Court explained, "[t]his [pattern-or-practice] evidence, of course, is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case." *Id.* at 347.[2]

---

[2]Respondent argues that, if *Miller-El I* made pattern-or-practice evidence relevant to the *Batson* analysis, it made consideration of such evidence permissible only in the final stage of the *Batson* analysis — not the first stage in which a prima facie case must be established. *Miller-El I* suggests otherwise. The Court repeatedly considered both categories of evi-

In sum, disregarding the prosecutor's pattern and practice of racial discrimination in jury selection directly conflicts with *Batson* and its progeny.[3]

Consideration of the trial-specific evidence together with the pattern-or-practice evidence compels a finding that Williams established a prima facie case that the prosecutor exercised his peremptory challenges in a racially discriminatory manner. *See, e.g.*, *Miller-El I*, 537 U.S. at 347 ("Our concerns . . . are heightened by the fact that, when presented with this [pattern-or-practice] evidence, the state trial court somehow reasoned that there was not even the inference of discrimination to support a prima facie case. This was clear error . . . .").[4]

---

dence, distinguishing them qualitatively, but not functionally. *See, e.g.*, *Miller-El I*, 537 U.S. at 331-35. In addition, the Court noted that the trial court that reheard Miller-El's claim in light of *Batson* "admitted all the evidence presented at the *Swain* hearing and further evidence and testimony from the attorneys in the original trial," *id.* at 329, and the Court later "conclude[d] . . . that the District Court did not give full consideration to the substantial evidence petitioner put forth *in support of the prima facie case*," *id.* at 341 (emphasis added).

[3]The fact that this pattern-or-practice evidence did not become available until after Williams' trial does not make it less probative of the prosecutor's discriminatory intent. The *Batson* inquiry is whether there was racial discrimination in the selection of Williams' jury. This question, like so many other claims of error that federal courts consider on habeas, concerns whether error occurred, not *when* evidence of the error became available. The panel opinion cited no case and offered no rationale to support a conclusion that the timing of discovery of relevant evidence should matter in proving a *Batson* claim. A pattern or practice of discrimination in jury selection is no less pernicious — and evidence of that pattern or practice is no less probative to the issue of prosecutorial intent — whether the pattern or practice was known at the time of the trial, or discovered subsequently.

[4]On remand, the Fifth Circuit denied Miller-El's *Batson* claim on the merits. *Miller-El v. Dretke*, 361 F.3d 849 (5th Cir. 2004). Miller-El again sought certiorari on the ground that the Fifth Circuit had ignored the Supreme Court's explicit guidance regarding the proper analytical frame-

### C.  The Requirement of Additional "Statistical" Evidence

The panel opinion discounted the evidence Williams presented because he failed to allege certain *additional* details concerning the prosecutor's use of challenges and the venire composition. In doing so, the opinion strayed on two counts: 1) Williams *did* allege some of the facts that the panel faulted him for failing to provide; and 2) there is no case, and the opinion cited none, that supports any conclusion that such additional allegations are *mandatory*. Indeed, a finding that Williams failed to make a prima facie showing predicated upon his failure to allege certain details regarding the composition of the jury venire directly conflicts with both the substance and the spirit of *Batson*.

In explaining its refusal to grant a COA on the *Batson* claim, the panel stated: "Although a pattern of strikes against African-Americans provides support for an inference of discrimination, Williams must point to more facts than the number of African-Americans struck to establish such a pattern. . . . Statistical facts like a high proportion of African-Americans struck and a disproportionate rate of strikes against African-Americans can establish a pattern of exclusion on the basis of race that gives rise to a *prima facie Batson* violation." *Williams I*, 384 F.3d at 584 (internal citation omitted). The panel went on to assert, incorrectly, that Williams did not provide such "statistical facts." *Id.* This characterization substantially misrepresents Williams' claim, for Williams has repeatedly alleged, and the record shows, that the prosecutor struck 100% (3 out of 3) of the African-Americans questioned

---

work for evaluating the merits of his *Batson* claim. Specifically, Miller-El claimed the lower court erred in disregarding, *inter alia*, evidence that one of the prosecutors in Miller-El's case had been found to have discriminated on the basis of race in another capital murder case. The Supreme Court voted to grant Miller-El's petition for certiorari. *See Miller-El v. Dretke*, 124 S. Ct. 2908, 72 USLW 3761, 72 USLW 3768 (U.S. Jun. 28, 2004) (NO. 03-9659).

by the parties, and exercised 3 out of 22 (14%) of his peremptory challenges against African-Americans. Nevertheless, the panel faulted Williams for failing to allege *additional* facts, such as "how many African-Americans were in the venire, and how large the venire was." *Id.* The panel opined that without such additional facts, "it is impossible to say whether any statistical disparity existed that might support an inference of discrimination." *Id.* Although Williams did not provide these particular bits of information about the venire, the provision of such information is neither mandatory nor particularly informative.[5]

While statistical analysis is *a* way to create the necessary inference of discrimination, it is not the *only* way. As noted above, we have often reiterated that "[t]o establish a prima facie case, [the defendant does] not need to show that the prosecution had engaged in a pattern of discriminatory strikes against more than one prospective juror. We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Vasquez-Lopez*, 22 F.3d at 902 (citations omitted); *see also United States v. Omoruyi*, 7 F.3d 880, 882 (9th Cir. 1993) (holding that evidence of a pattern of discrimination is not necessary where other evidence reveals discriminatory motive in challenging jurors exists). If evidence of a pattern of discrimination is not a prerequisite for a prima facie *Batson* case, surely *statistical-pattern* evidence is not a prerequisite either.

Imposition of specific evidentiary requirements for a *Batson* prima facie showing directly conflicts with the Third Circuit's holding in *Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004), *cert. denied*, 73 USLW 3266 (U.S. Nov. 01, 2004) (NO. 04-101). Rejecting Pennsylvania's imposition of comparable evidentiary requirements, the Third Circuit explained:

---

[5]This evidentiary demand is also ill-advised in light of the fact that the district court denied Williams' timely discovery request *after* it had already granted summary judgment in favor of Respondent.

> Notably absent from the *Batson* discussion of the prima facie case is any call for trial judges to seek the type of statistical accounting required by [Pennsylvania's evidentiary] rule nor do we see how such an accounting fits within *Batson*'s first step. A trial judge undoubtedly might find in a given case that a full accounting regarding the race of the venire and the jurors struck would be helpful at the *third* stage of the *Batson* analysis, after it has heard the prosecutor's explanation for the strikes and must determine if the defendant has established purposeful discrimination. But requiring the presentation of such a record simply to move past the first stage in the *Batson* analysis places an undue burden upon the defendant.

*Holloway*, 355 F.3d at 728 (citation and internal quotation marks omitted) (emphasis added); *see also United States v. Hughes*, 880 F.2d 101, 102 (8th Cir. 1989) ("we have never held that the Supreme Court contemplated the use of a purely numerical formula" in determining the existence of a *Batson* prima facie case); *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987) (prima facie case established "even though we are here concerned with only a single juror").

In sum, this case should have been reviewed as *Batson* and *Swain* require: the correct prima facie standard should have been applied; all of the relevant evidence should have been considered, including the pattern-or-practice evidence relating to this prosecutor; and Williams should not have been penalized for a lack of certain nonmandatory details in his proof, particularly since he was refused discovery.

## D.   The Standard for Granting a COA

Because Williams made a strong prima facie showing of his *Batson* claim, we should have granted a COA.

> [A] prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.' A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El I*, 537 U.S. at 327 (citations omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002).

Even if Williams' prima facie showing were no more than debatable, the court was obligated to grant a COA. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straight-forward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El I*, 537 U.S. at 338 (citation omitted). Here, the district court granted summary judgment in favor of Respondent on Williams' *Batson* claim after erroneously concluding that "Petitioner has failed to make a prima facie showing of purposeful discrimination." *Williams v. Calderon*, 48 F. Supp. 2d 979, 997-98 (C.D. Cal. 1998) (*Williams II*). The district court reached this conclusion after denying Williams' discovery request, refusing to hold an evidentiary hearing, making factual errors (that the panel opinion adopts), and erroneously placing the burden on Williams to prove that the prosecution did not have race-neutral reasons for its challenges. *Id.* The district court's denial of the *Batson* claim was wrong, and the panel's denial of a COA sends a man to his death without adequate review of his substantial constitutional claims.

## II.   An Evidentiary Hearing on the *Batson* Claim or a New Trial Should Have Been Granted

Williams, at a minimum, is entitled to an evidentiary hearing on his *Batson* claim, if not a new trial.[6] If proper and timely objection is made, the course of a *Batson* determination would be as follows:

> In determining whether a party impermissibly has used peremptory challenges in a way that violates the equal protection clause, we employ the *Batson* three-step test. First, the objecting party is required to make a prima facie showing that another party has used peremptory challenges on the basis of race. Second, assuming the objecting party makes its showing, the burden shifts to the challenging party to state race-neutral reasons for excusing the prospective jurors. Third, the court must determine if the objecting party has proven purposeful discrimination.

*Montiel*, 2 F.3d at 340 (citations omitted). In the *Batson* analysis, "it does not matter that the prosecutor might have had good reasons to strike the prospective jurors, what matters is the *real* reason they were stricken." *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (emphasis in the original). Because Williams has presented more than sufficient evidence to satisfy step one, the court was obligated to reach steps two and three. *Id.* at 1089-90; *see also Tankleff*, 135 F.3d 235, 249-50 (2d Cir. 1998) (recognizing difficulty in determining whether there was a *Batson* violation years after trial occurred but holding that where petitioner made a prima facie showing of a *Batson* violation but was never given opportunity to reach steps two and three, petitioner nonethe-

---

[6]Because Williams filed his federal habeas petition in 1989, the AEDPA does not apply to his case.

less was entitled to either an evidentiary hearing *or* a new trial).

Where, as here, the habeas petitioner failed to develop the facts of his constitutional claim before the state trial court, the district court must review the answer, transcript, and record and determine whether an evidentiary hearing is required. In any case, the district court may exercise its discretion to hold an evidentiary hearing, but in certain cases, an evidentiary hearing is mandatory. This is such a case.

Williams is "entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12 (1992). " 'Cause' is a legitimate excuse for the default; 'prejudice' is actual harm resulting from the alleged constitutional violation." *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984) (citation omitted).

In this case, the "cause" for Williams' failure to develop the facts of his *Wheeler*[7]/*Batson* claim before the state trial court is the ineffective assistance of his trial counsel. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding that ineffective assistance of counsel that rises to the level of a constitutional violation constitutes "cause").[8]

---

[7] In *People v. Wheeler*, 22 Cal. 3d 258 (1978), the California Supreme Court held that the racially discriminatory use of peremptory challenges violated the state constitution. *Id.* at 276-77. It also established a procedure and an evidentiary burden for raising a racial discrimination claim that are comparable to those later adopted in *Batson*. *Compare Wheeler*, 22 Cal.3d at 280, *with Batson*, 476 U.S. at 96. Thus, "we have held that a *Wheeler* motion is the procedural equivalent of a *Batson* challenge in California." *Paulino*, 371 F.3d at 1088 n.4 (citations omitted).

[8] I discuss in detail, *infra* Part III, the reasons why the performance of Williams' trial counsel constituted ineffective assistance of counsel within the meaning of *Strickland*.

The "prejudice" requirement is satisfied in two ways. First, because a *Batson* violation is structural error, actual harm is presumed to have resulted from the alleged constitutional violation. Second, because there is a reasonable probability that, but for the alleged *Batson* violation and the related ineffective assistance of counsel, there would have been a more racially diverse jury, Williams was actually prejudiced by the seating of an all-white jury instead of a more racially diverse one.

A *Batson* violation is structural error for which prejudice is generally presumed. As the Court explained in *Powers v. Ohio*, 499 U.S. 400 (1991):

> The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability. Active discrimination by a prosecutor during this process condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law. The cynicism may be aggravated if race is implicated in the trial . . .

> . . .

> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood

in these terms if the jury is chosen by unlawful means at the outset.

*Id.* at 411-13 (citations and internal quotation marks omitted); *see also United States v. Angel*, 355 F.3d 462, 470-71 (6th Cir. 2004) ("Although the 'plain error' standard of review generally applies to claims raised for the first time on appeal, any racial discrimination in jury selection constitutes structural error that requires automatic reversal." (citations omitted)); *Tankleff*, 135 F.3d at 248 (noting that racial discrimination in jury selection is structural error and therefore not subject to harmless error review; collecting cases); *Rosa v. Peters*, 36 F.3d 625, 634 n.17 (7th Cir. 1994). Because the same jury sat during both the guilt and penalty phases of Williams' trial, we can presume that both phases were affected by the *Batson* violation.

Additionally, the seating of an all-white jury, as opposed to a more diverse jury, prejudiced Williams' defense. In *Hollis v. Davis*, 941 F.2d 1471, 1478 (11th Cir. 1991), the Eleventh Circuit found that trial counsel's failure to object to racial discrimination in jury selection in a capital case was ineffective assistance of counsel. In addition, the court found that the procedural default of petitioner's failing to raise an equal protection claim was excused because the ineffective assistance constituted cause and the client suffered actual prejudice from that error. *Id. Hollis* is powerfully persuasive precedent. Like Williams, Hollis was an African-American defendant who was tried for a death-eligible crime by an all-white jury.

The Eleventh Circuit has recognized the prejudicial effect of "[t]he systmatic exclusion of blacks from jury eligibility." *Hollis*, 941 F.2d at 1480 (citing *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (noting that to prevent prejudice, a defendant indicted by a grand jury from which blacks had been excluded was entitled to be released).

As Justice Jackson noted in *Cassell v. Texas*:

> It is obvious that discriminatory exclusion of Negroes from a trial jury does, or at least may, prejudice a Negro's right to a fair trial . . . . The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding, it is influenced by imponderables — unconscious and conscious prejudices and preferences — and a thousand things we cannot detect or isolate in its verdict and whose influence we cannot weigh. . . . A trial jury on which one of the defendant's race has no chance to sit may not have the substance, and cannot have the appearance, of impartiality, especially when the accused is a Negro and the alleged victim is not.

339 U.S. 282, 301-02 (1950) Jackson, J. dissenting. The Eleventh Circuit further reasoned that it would have greater confidence in the result reached by a racially mixed "jury containing members of the defendant's own race, particularly where the black defendant is on trial for an offense against a white person." *Hollis,* 971 F.2d at 1483.

That Williams was facing the death penalty only heightens the prejudicial nature of racial discrimination in the selection of his jury. As the Court noted in *Turner v. Murray*, 476 U.S. 28 (1986): "In a capital sentencing proceeding before a jury, the jury is called upon to make a highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves." *Id.* at 33-34 (citation and internal quotation marks omitted). Thus, "at least as to sentencing, there is a probability of a different result, but for the unconstitutional jury selection, sufficient to undermine confidence in the outcome . . . [and that] the improperly selected jury infected [the defendant's] entire trial with error of constitutional dimensions." *Hollis*, 941 F.2d at 1483 (citations and internal quotation marks omitted).

### III.  Williams' Claim of Ineffective Assistance of Counsel Based on Counsel's Failure to Raise *Batson/ Wheeler* Objection

Williams argues, and I agree, that his counsel's failure to object to the discriminatory use of peremptory challenges constituted ineffective assistance. Without explanation, the opinion ignores this constitutional claim.

### A.   *Failure to Object to the Batson Violation*

In his federal habeas petition, Williams alleged that his counsel's failure to object to the prosecutor's racially discriminatory exercise of peremptory challenges constituted ineffective assistance of counsel.[9]

The district court correctly concluded that Williams' trial counsel could have provided ineffective assistance by failing to raise a *Batson* objection even though that case had not been decided at the time of trial. *Williams II*, 48 F. Supp. 2d at 998.

However, the district court, inexplicably, granted Respondent's motion for summary judgment, finding that Williams "failed to establish that any reasonable attorney under the circumstances would have objected to the prosecution's use of peremptory challenges and cannot establish that the objection would have been sustained." *Id*. This is simply not so. Because "jurists of reason could disagree with the district court's resolution of his constitutional claims or . . . could conclude the issues presented are adequate to deserve encouragement to proceed further," *Miller-El I*, 537 U.S. at 1034, a COA on Williams' ineffective assistance of counsel claims should have issued.

---

[9]Williams raised and exhausted this claim in his fourth state habeas petition.

*B. No "Reasonable Professional Judgment" Was Involved*

Any reasonable attorney under the circumstances of this case would have objected to the prosecution's use of peremptory challenges to rid the jury of African-Americans. The California Supreme Court cases reversing the judgments of death obtained by the very same prosecutor that tried Williams' case make clear that defense attorneys were making "*Wheeler* motions" under similar circumstances at that time. These cases also make clear that if Williams' trial counsel had made a *Wheeler* motion, there is a reasonable probability that he would have succeeded.

Indeed, trial counsel admits as much. In a sworn declaration, counsel admitted that he was "well aware of *People v. Wheeler*," that he noted that the prosecution was striking African-Americans, and that he knew he could make a prima facie showing based on the prosecutor's striking of three African-Americans under *Wheeler*. [Declaration of trial counsel, Mar. 23, 1994] ("I . . . do not recall why I did not make a motion pursuant to *Wheeler* in order to have the prosecutor justify his removal of the black jurors in Mr. Williams' case. I knew that the exclusion of three jurors of the same race as the defendant in a cross-racial prosecution constituted a prima facie case, which should have shifted the burden to the prosecutor to justify each challenge exercised against one of the black jurors. I was unhappy with the jury in this case. Co-counsel and I exercised all of our peremptory challenges in an attempt to obtain a jury representative of Mr. Williams' community. The jury that was sworn was not such a representative cross-section.")

We cannot characterize the failure of Williams' counsel to object to the prosecutor's discriminatory strikes as a permissible "strategic choice" or "tactical decision." "While [trial counsel] was not totally clear as to why he did not challenge the jury composition, it is impossible to conclude from his statements that he had made a reasoned, professional judg-

ment that not raising the issue was in [Mr. Williams'] interest." *Hollis*, 941 F.2d at 1478 (finding failure to object to racial discrimination in jury selection was ineffective assistance of counsel).

How the district court could have held that it was not established that any reasonable attorney would have objected under the circumstances is inexplicable. Williams' trial counsel knew about *Wheeler*. He cannot claim ignorance or lack of clarity in the law. Making a *Wheeler* motion would have preserved a critical constitutional right. The trial attorney missed more than one opportunity to make that simple motion: he could have made the motion after the first strike, the second strike, the third strike, or at the conclusion of jury selection — when he knew the prosecutor's challenges had resulted in the seating of an all-white jury. Any way you slice it, counsel's failure to object constituted ineffective assistance of counsel, and we should not hesitate to say so.

## C. Actual Prejudice to Williams' Defense

A petitioner shows prejudice due to ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland v. Washington*, 466 U.S. 668, 693 (1984).

There is a reasonable probability that, had counsel objected to the prosecutor's discriminatory strikes, Williams would have succeeded in proving that the prosecutor was engaging in impermissible racial discrimination as prohibited by *Batson*. This probability is sufficient to undermine confidence in the outcome of the trial because a *Batson* violation is structural error. *See Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (noting that structural defects in the constitution of the

trial mechanism "defy analysis by 'harmless-error' standards"); *see also United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004) (holding that "[w]e only review for plain error or assess whether an error is harmless when the error is not structural") (citation omitted)). Additionally, there is prejudice because there is a reasonable probability that had the motion been made, racial discrimination in the jury selection process would have been remedied, and the outcome of either the guilt phase or the penalty phase would have been different. *See* Part II, *supra.*

> The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury . . . [R]acial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt.
>
> . . .
>
> A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause . . . .

*Powers*, 499 U.S. at 411-13 (citations and internal quotation marks omitted).

If our judicial system is to inspire a sense of confidence among the populace, we must not, we cannot permit trials to proceed in the face of blatant, race-based jury selection practices. Failure to grant a COA in this case sends an unmistakable message that the dictates of *Batson* may be disregarded with impunity. I cannot join that message.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.